## THE GRAPESHOT.

1. When, during the late civil war, portions of the insurgent territory were occupied by the National forces, it was within the constitutional authority of the President, as commander-in-chief, to establish therein provisional courts for the hearing and determination of all causes arising under the laws of the State or of the United States, and the Provisional Court for the State of Louisiana, organized under the proclamation of October 20th, 1862, was, therefore, rightfully authorized to exercise such jurisdiction.

2 When, upon the close of the war, and the consequent dissolution of the court thus established, Congress, in the exercise of its general authority in relation to the National courts, directed that causes pending in the Provisional Court, and judgments, orders, and decrees rendered by it, which, under ordinary circumstances, would have been proper for the jurisdiction of the Circuit Court of the United States, should be transferred to that court and have effect as if originally brought, or rendered therein, a decree in admiralty rendered in the Provisional Court, as upon appeal from the District Court, became at once, upon transfer, the decree of the Circuit Court; and an appeal was properly taken from it to this court.

3. Liens for repairs and supplies, whether implied or express, can be enforced in admiralty only upon proof made by the creditor that the repairs or supplies were necessary, or believed, upon due inquiry and credible representation, to be necessary in a foreign port.

4. Where proof is made of necessity for the repairs or supplies, or for funds raised to pay for them by the master, and of credit given to the ship, a presumption will arise, conclusive in the absence of evidence to the contrary, of necessity for credit. The cases of *Pratt* v. *Reed* and *Thomas* v. *Osborn* explained.

5. Necessity for repairs and supplies is proved where such circumstances of exigency are shown as would induce a prudent owner, if present, to

order them, or to provide funds for the cost of them on the security of the ship.

6. The ordering by the master of supplies and repairs on the credit of the ship is sufficient proof of such necessity to support an implied hypothecation in favor of the material-man, or of the ordinary lender of money to meet the wants of the ship, who acts in good faith.

7. To support hypothecation by bottomry, evidence of actual necessity for repairs and supplies is required, and, if the fact of such necessity be left unproved, evidence is required of due inquiry and of reasonable grounds of belief that the necessity was real and exigent.

THIS case, which in its original form, was a libel in the District Court of Louisiana, on a bottomry bond, and, as such, involved nothing but the correct presentation of the principles of maritime law relating to that matter, and the examination of a good deal of contradictory evidence, to see how far the particular case came within them, presented subsequently, and in consequence of the rebellion and the occupation by our army of the mere city of New Orleans, while the region surrounding it generally was still held by the Confederate powers and troops, a great question of constitutional law, the question namely, how far, with that clause of the Constitution in force which declares that—

" The judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the *Congress* may from time to time *ordain and establish*,"—

the President could establish a Provisional Court, and how far Congress, on the suppression of the rebellion, could, by *its* enactment, validate the doings of such a court, transfer its judgments, and make them judgments of the now re-established former and proper Federal courts, from one of which, the Circuit Court of the United States for the District of Louisiana, the cause purported to be brought here.

The case—which in this court consisted accordingly of three parts—to wit:

1. The matter of jurisdiction,

2. That of the principles of maritime law in regard to bottomry bonds,

3. The one of their application to the particular case, on the evidence, is all stated in the opinion of the court, not all consecutively in the opening of it, but all completely enough and with distinctness from the opinion itself, in three different parts, as the three respective topics arise to be treated of.

*Mr. C. Cushing, for the owners of the ship, appellants; Mr. T. J. Durant, contra.*

The CHIEF JUSTICE delivered the opinion of the court.

The first question to be examined in this case is one of jurisdiction.

The suit, shown by the record, was originally instituted in the District Court of the United States for the District of Louisiana, where a decree was rendered for the libellant. From this decree an appeal was taken to the Circuit Court, where the case was pending, when, in 1861, the proceedings of the court were interrupted by the civil war. Louisiana had become involved in the rebellion, and the courts and officers of the United States were excluded from its limits. In 1862, however, the National authority had been partially re-established in the State, though still liable to be overthrown by the vicissitudes of war. The troops of the Union occupied New Orleans, and held military possession of the city and such other portions of the State as had submitted to the General government. The nature of this occupation and possession was fully explained in the case of *The Venice*.*

Whilst it continued, on the 20th of October, 1862, President Lincoln, by proclamation, instituted a Provisional Court for the State of Louisiana, with authority, among other powers, to hear, try, and determine all causes in admiralty. Subsequently, by consent of parties, this cause was transferred into the Provisional Court thus constituted, and was heard, and a decree was again rendered in favor of the libellants. Upon the restoration of civil authority in the State,

* 2 Wallace, 259.

the Provisional Court, limited in duration, according to the terms of the proclamation, by that event, ceased to exist.

On the 28th of July, 1866, Congress enacted that all suits, causes, and proceedings in the Provisional Court, proper for the jurisdiction of the Circuit Court of the United States for the Eastern District of Louisiana, should be transferred to that court, and heard and determined therein; and that all judgments, orders, and decrees of the Provisional Court in causes transferred to the Circuit Court should at once become the orders, judgments, and decrees of that court, and might be enforced, pleaded, and proved accordingly.*

It is questioned upon these facts whether the establishment by the President of a Provisional Court was warranted by the Constitution.

That the late rebellion, when it assumed the character of civil war, was attended by the general incidents of a regular war, has been so frequently declared here that nothing further need be said on that point.

The object of the National government, indeed, was neither conquest nor subjugation, but the overthrow of the insurgent organization, the suppression of insurrection, and the re-establishment of legitimate authority. But in the attainment of these ends, through military force, it became the duty of the National government, wherever the insurgent power was overthrown, and the territory which had been dominated by it was occupied by the National forces, to provide as far as possible, so long as the war continued, for the security of persons and property, and for the administration of justice.

The duty of the National government, in this respect, was no other than that which devolves upon the government of a regular belligerent occupying, during war, the territory of another belligerent. It was a military duty, to be performed by the President as commander-in-chief, and intrusted as such with the direction of the military force by which the occupation was held.

---

* 15 Stat. at Large, 366.

What that duty is, when the territory occupied by the National forces is foreign territory, has been declared by this court in several cases arising from such occupation during the late war with Mexico. In the case of *Leitensdorfer* v. *Webb*,\* the authority of the officer holding possession for the United States to establish a provisional government was sustained; and the reasons by which that judgment was supported, apply directly to the establishment of the Provisional Court in Louisiana. The cases of *Jecker* v. *Montgomery*,† and *Cross* v. *Harrison*,‡ may also be cited in illustration of the principles applicable to military occupation.

We have no doubt that the Provisional Court of Louisiana was properly established by the President in the exercise of his constitutional authority during war; or that Congress had power, upon the close of the war, and the dissolution of the Provisional Court, to provide for the transfer of cases pending in that court, and of its judgments and decrees, to the proper courts of the United States.

The case then being regularly here, we will proceed to dispose of it.

The object of the original suit was the enforcement of a lien upon the bark Grapeshot, created by a bottomry bond, executed by her master, one Joseph S. Clark, in favor of Wallerstein, Massett & Co., at Rio Janeiro, upon the 15th of April, 1858.

The libel, filed by Wallerstein, Massett & Co., on the 3d of July, 1858, alleged that the bark Grapeshot, lying in the port of Rio, during the month of April, 1858, was in great need of reparation, provisions, and other necessaries to render her fit and capable of proceeding thence on her intended voyage to the port of New Orleans; and Joseph S. Clark, the master of the bark, not having any funds or credit there, and the owner of the said bark not residing in Rio, and having no funds or credit there, that the libellants, at

---

\* 20 Howard, 176.                    † 13 Id. 498, and 18 Id. 110.

‡ 16 Id. 164; see also United States v. Rice, 4 Wheaton, 246; and Texas v. White, 7 Wallace, 700.

the request of Clark, advanced and lent to him $9767.40, on the bottomry and hypothecation of the bark, at the rate of 19½ per cent. maritime interest; that Clark, as master, did really expend the sum borrowed for the repairing, victualling, and manning of the bark in order to enable her to proceed to New Orleans; that the bark could not possibly have proceeded with safety upon her voyage without such repairs, and other necessary expenses attending the refitting of her; that she sailed and arrived safe at New Orleans on or about the 7th of June, 1858; and, that the bond was, at the proper time, presented for payment to Clark, who refused to discharge it.

Upon this libel, process was issued, and the vessel and her freight were seized. Subsequently the vessel was sold under an order of the court, and the proceeds, together with the freight-money, amounting, in the whole, to $13,805.85, were deposited in the registry on the 2d of September, 1858.

On the 1st of November, 1858, George Law, the claimant of the vessel and freight, filed his answer, denying the necessity of the repairs and supplies, alleged to have been paid for by the money raised upon the bottomry bond, and alleging fraudulent collusion between the master and the lenders, to the prejudice of the claimant. The answer set out at large the history of the Grapeshot, from the time she left New York, on or about the 9th of February, 1857, to the date of her arrival in New Orleans, on or about the 7th of June, 1858. It represented that the bark, when she left New York, was stout and staunch, well fitted, and supplied for her then intended voyage to Constantinople, and for the return voyage to New York; that, instead of returning from Constantinople to New York, the master, Clark, embezzled the freight earned in the voyage out, and engaged the vessel in voyages for his own benefit, until he caused her to be stripped at Rio of her copper, which was replaced by second-hand and indifferent metal, owned by Clark, and put on her in fraud of the claimant; that the dishonest practices of Clark were well known at Rio, and that the libellants were fully cognizant of them. The answer further denied the charge

Opinion of the court on the second point.

of the libel that the claimant had no funds or credit at Rio, and averred that he had credit to procure and obtain the necessary funds, and that the master was under no necessity to resort to the bottomry upon the vessel. The answer further alleged that there was no inspection or survey of the vessel with reference to the necessity for repairs; and that the alleged expenses for repairs and provisions far exceeded the sums actually expended, of all which the libellants had notice.

Before proceeding to examine the evidence, taken under these pleadings, it will be proper to consider the principles of maritime law applicable to the case.

A bottomry bond is an obligation, executed, generally, in a foreign port, by the master of a vessel for repayment of advances to supply the necessities of the ship, together with such interest as may be agreed on; which bond creates a lien on the ship, which may be enforced in admiralty in case of her safe arrival at the port of destination; but becomes absolutely void and of no effect in case of her loss before arrival.*

Such a bond carries usually a very high rate of interest, to cover the risk of loss of the ship as well as a liberal indemnity for other risks and for the use of the money, and will bind the ship only where the necessity for supplies and repairs, in order to the performance of a contemplated voyage, is a real necessity, and neither the master nor owners have funds or credit available to meet the wants of the vessel.

Sometimes bonds, bearing only the ordinary rate of interest, or executed under circumstances more or less different from those just stated, are called bottomry bonds, and are enforced as such;† but the general description just given embraces most instruments known under that name, and is sufficiently accurate for the case presented by the record.

---

* Carrington v. Pratt, 18 Howard, 67; The Atlas, 2 Haggard, 57–8.

† The Trident 1 W. Robinson, 29; Brig Draco, 2 Sumner, 157; 1 Parsons on Shipping, 116, 120.

There is no question in this case as to the character of the bond; nor as to the safe arrival of the ship; nor as to the validity of the bond if the lien can be held valid. The controversy turns on the question of necessity for repairs and supplies, and for credit.

We are to consider, therefore, what degree of necessity for supplies or repairs, and what degree of necessity for credit in that form, will warrant a master in borrowing upon bottomry.

Where the claim of the material-man is against the owner only, and no privilege is given upon the vessel, no necessity need be shown affirmatively. The master, in the absence of known fraud, is fully authorized to represent the owners in all matters relating to the ship; and it will always be presumed that supplies and repairs, ordered by the master, were reasonably fit and proper, unless there is clear proof to the contrary, and also proof of collusion by the material-man.

But something more is required when the claim is against the ship itself. Such a claim can be asserted only as a lien or privilege upon the vessel. And the rule is that such a lien for supplies and materials, or for money advanced for the ship, since it is created and exists without record, or other public notice, can only be established upon circumstances of actual necessity.

Proof of absolute and indispensable necessity, however, is not required in order to the establishment of such a lien, where supplies and materials are furnished on the credit of the ship, or of the ship and owners, in a foreign port. In such cases, courts of admiralty do not scrutinize narrowly the account against the ship. They will reject, undoubtedly, all unwarranted* charges; but upon proof that the furnishing was in good faith, on the order of the master, and really necessary, or honestly and reasonably believed by the furnisher to be necessary for the ship while lying in port, or to fit her for an intended voyage, the lien will be supported;† unless

---

\* The Cognac, 2 Haggard, 387.

† The General Smith, 4 Wheaton, 443; Peyroux v. Howard, 7 Peters, 324; Brig Nestor, 1 Sumner, 73.

it is made to appear affirmatively that the credit to the ship was unnecessary, either by reason of the master having funds in his possession applicable to the expenses incurred, or credit of his own or of his owners, upon which funds could be raised by the use of reasonable diligence; and that the material-man knew, or could, by proper inquiry, have readily informed himself of the facts.*

It has been supposed that a more stringent rule than that just stated was sanctioned by this court, at the December Term, 1856, in the case of *The Sultana*, reported under the title of *Pratt* v. *Reed*.†

In that case, coal for generating steam was supplied to the Sultana, of Buffalo, in New York, at Erie, in Pennsylvania. The master was sole owner, and known as such by the furnisher of the coal. The supplies were furnished from time to time during a period of nearly two years, and formed the subject of a running account of debit and credit extending through that time. The evidence warranted the impression, confirmed by the fact of sole ownership in the master, that the credit was given to the master and not to the ship. It was held that no lien attached to the steamer for the supplies thus furnished.

We have no doubt that the case was rightly decided. There are, however, expressions in the opinion which, separated from the case, appear to sanction the doctrine that, in order to the creation of a lien on the vessel, express proof is necessary of an unforeseen emergency creating a necessity for supplies, and also of the existence of a necessity for credit on the ship.

But that it was not intended by the court to establish any other rule than that previously recognized, sufficiently appears from an opinion pronounced in the case of *The Neversink*,‡ by the learned judge who delivered its judgment in the case of *The Sultana*. What was said in the former case sufficiently shows that the latter judgment was intended only

---

* The Fortitude, 3 Sumner, 246–7.　　　　† 19 Howard, 359.
‡ Southern District of New York, November, 1867.

Opinion of the court on the second point.

to affirm that there must be an apparent necessity for the credit as well as an actual necessity for the supplies, and that in the case before the court there was, in fact, no such necessity as was essential to the creation of a lien upon the steamer. It was not intended to deny that this apparent necessity might be presumed from the necessity for supplies, from the general authority of the master, and from general good faith in the particular transaction.

It has been supposed also that the judgment of this court in the case of *The Bark Laura*, reported as *Thomas* v. *Osborn*,* required affirmative proof of the necessity of credit to the ship, in order to the creation of a lien on the vessel. The court said, that "the limitation of the authority of the master to cases of necessity, not only of repairs and supplies, but of credit to obtain them, and the requirement that the lender or furnisher should see to it that apparently such a case of necessity exists, are as ancient and well established as the authority itself." There is nothing in the language which necessarily denies that proved necessity for repairs may be received as presumptive evidence, sufficient, in the absence of other information, to establish a case of apparent necessity upon which the lender or furnisher may safely act. And the citations from the Digest and the Consolato del Mare, made to show the antiquity of the doctrine, seem to have reference only to the condition of the ship, and not to the condition of the credit of the owners or master.

We are satisfied that neither of the two cases just referred to, when properly considered in connection with the proofs before the court, can be regarded as in conflict with the rule we have stated, which, prior to these decisions, had been undoubtedly received upon the general consent of authorities as the true rule on the subject of implied hypothecation for repairs and supplies, or for advances having the same relation to the ship.

We have been induced to state this doctrine of implied hypothecation somewhat fully, not only because it seemed

---

* 19 Howard, 29.

desirable to correct a common misunderstanding of these cases; but because of the close analogy in origin, effect, and incidents between implied hypothecation and express hypothecation by bottomry.

It is, indeed, difficult to trace, either in reason or in the authorities, any marked line of discrimination between them. In the case of *The Aurora*, decided in 1816, this court said: "To make a bottomry bond, executed by the master, a valid hypothecation, it must be shown by the creditor that the master acted within the scope of his authority, or, in other words, that the advances were made for repairs or supplies necessary for effecting the objects of the voyage, or the safety and security of the ship. And no presumption should arise in the case that such repairs or supplies could be procured on reasonable terms with the credit of the owner, independent of such hypothecation."*

And it was further said, in the same case, that "it is incumbent on the creditor who claims an hypothecation to prove the actual existence of those things which gave rise to his demand; and if it appear on his own showing, or otherwise, that he has funds of the owners in his possession which might have been applied to the demand, and he has neglected or refused to do so, he must fail in his claim."†

And this, undoubtedly, is the general rule also in respect to implied hypothecation. The principles on which it rests were fully explained and illustrated by Mr. Justice Story, in 1838, in the case of *The Fortitude*.‡

It has been thought that a distinction between the lien for repairs and supplies, or ordinary advances to pay for them, and the lien of bottomry, may be found in that "superadded necessity" of which the learned judge speaks, in the case last cited, as distinguishing the former from the latter. There must, he said in substance, not only be a necessity for the repairs, but a necessity for resorting to a bottomry loan.§ But this ruling must be taken with the qualification previously established by this court in the case of *The*

* 1 Wheaton. 96.          † Ib. 105.          ‡ 3 Sumner, 232.
§ The Fortitude, 3 Sumner, 234.

*Virgin,*\* where it was held that "the necessity of the supplies and repairs being once made out, it is incumbent on the owners, who assert that they could have been obtained upon their personal credit without bottomry, to establish that fact by competent proofs, unless it is apparent from the circumstances of the case." It is only when such competent proofs have been adduced, or the practicability of raising funds on credit has been made to appear from circumstances, that the lender is held responsible for failing to make due inquiry.

In the absence of such proofs or circumstances, an apparent necessity for credit by bottomry must be regarded as established when the necessity for repairs is proved.

A more substantial distinction between the implied and the express hypothecation may, perhaps, be found in the greater diligence required of the lender on bottomry than of the material-man in inquiry concerning the necessity for repairs. The authorities on this subject are not easily reconciled; but they may be best harmonized, perhaps, in the proposition that if no necessity for repairs is established a bottomry bond will not be supported in the absence of proof that the lender, after using reasonable diligence to ascertain the facts, had good reason to believe, and did believe, that the necessity really existed. And this is warranted by good reason. The maritime law seeks equally the general promotion of commercial intercourse and the most complete security in private transactions; and neither can well be reconciled with the support of hypothecations which partake largely of the nature of hazard, made where the owner cannot be consulted, at extraordinary rates of interest, agreed upon by the master and the lender, and under circumstances favorable to collusion and fraud, unless the lender be held to reasonable diligence in inquiring as to the existence of the facts of distress and necessity for repairs, which alone warrant such transactions.

The doctrine on the subject of maritime hypothecation, so far as it seems useful to consider it in this case, may be summed up, we think, in these propositions:

\* 8 Peters, 554.

1. Liens for repairs and supplies, whether implied or express, can be enforced in admiralty only upon proof made by the creditor that the repairs or supplies were necessary, or believed, upon due inquiry and credible representation, to be necessary.

2. Where proof is made of necessity for the repairs or supplies, or for funds raised to pay for them by the master, and of credit given to the ship, a presumption will arise, conclusive, in the absence of evidence to the contrary, of necessity for credit.

3. Necessity for repairs and supplies is proved where such circumstances of exigency are shown as would induce a prudent owner, if present, to order them, or to provide funds for the cost of them on the security of the ship.

4. The ordering, by the master, of supplies or repairs upon the credit of the ship, is sufficient proof of such necessity to support an implied hypothecation in favor of the materialman, or of the ordinary lender of money, to meet the wants of the ship, who acts in good faith.

5. To support hypothecation by bottomry, evidence of actual necessity for repairs and supplies is required, and, if the fact of necessity be left unproved, evidence is also required of due inquiry and of reasonable grounds of belief that the necessity was real and exigent.

These principles are now to be applied to the case before us. The pleadings make distinct issues upon the necessity for repairs, the necessity for credit, and exercise of due diligence in inquiry by the lender.

On examining the proofs we find great contrariety in evidence, but we think it sufficiently established that Clark, the master of the Grapeshot, if not guilty of actual fraud, was very negligent of his duties as master.

It is alleged in the answer, and the allegation is supported by credible testimony, that the voyage for which she was originally destined was from New York to Constantinople, and back. The bark sailed from New York in February, 1857, and the voyage to Constantinople was accomplished

in due time; but, instead of obtaining a return freight for New York, the master engaged the bark in a new voyage. He purchased a cargo of salt, partly at Ivica and partly at the Isle de Sal, one of the Cape de Verde Islands, and carried it to Rio, where he lay for some time, then returned to the islands for another cargo of salt, with which he arrived at Rio early in January, 1858, and remained there until April, when he finally took a cargo for the United States; not then, however, for New York, but for New Orleans.

There is some evidence that the new voyages were for purposes of private speculation by the master, and this theory receives partial confirmation from a letter written by him to the owner from Constantinople, in which he admits that he could obtain a paying freight for New York, but states that he had determined to seek more profitable employment for the vessel, in a voyage to Rio with salt. On the other hand, it appears that nothing was kept secret from the owner, unless it be the fact of private speculation, for the letters of the master show that he was advised from time to time of all the movements of the vessel.

These transactions are adverted to only because, though having no direct bearing upon the case, they cast some light upon the subsequent conduct of the master.

The liabilities, except those charged under date of October 31st, 1857, which form the basis of the bottomry bond, were incurred, if incurred at all, while the ship remained at Rio, from January 2d to April 19th, 1858. They consist of charges for supplies and repairs.

As to the necessity for repairs, the libellants have put in the depositions of Clark, the master, and of the furnishers at Rio. The respondent, on his side, has put in the depositions of several seamen who made part of the crew of the Grapeshot.

The evidence of these witnesses cannot be reconciled. The witnesses for the libellants are positively contradicted by the witnesses for the respondent. Clark, for example, says that on the last voyage to the Cape de Verde Islands and back to Rio, the Grapeshot leaked badly, and that she lost

nine hundred bushels of salt by the water from the leaking.
And, as to the leaking, his testimony is, to some extent,
corroborated by that of the repairer.   But three of the crew,
examined on this point, testify positively that there was no
damage from leaking.   As to injuries to the bottom of the
vessel, and the necessity for recoppering, Clark says nothing
in his deposition; he merely states that the accounts of the
material-men are just and correct, and they testify that the
repairs and supplies were necessary.   On the other hand,
some of the crew testify that the repairs were quite unneces-
sary, that the copper put upon her was inferior to the cop-
per taken off, and that the vessel when nominally repaired
was less staunch than before.   There is more to the same
effect.

It is said that the evidence of the seamen is unworthy of
credit.   It was certainly taken in a very loose and unsatis-
factory way.   But this was the fault of the commissioner,
and not of the witnesses.   On the main points at issue their
testimony is clear and distinct enough, and we perceive no
reason for discrediting it.

We have examined it with care, and, taken in connection
with the whole evidence on both sides, it has satisfied us that
we cannot hold the necessity for repairs as established.

And this view is confirmed by the absence of any survey
or examination by public authority, or by competent and
disinterested persons for the purpose of ascertaining the ne-
cessity for repairs.   In the case of *The Cognac* the bottomry
bond was authorized by the French Tribunal of Commerce
at the port of repair, and also by the British vice-consul
there, and yet the British Court of Admiralty disallowed
some of the items covered by the bond.*   And in the case
of *The Fortitude* the bottomry bond was supported by evi-
dence of a survey, called by the master and conducted by
persons skilled in nautical affairs.   This was, as the learned
judge observed, "what every prudent master ought to do
under the like circumstances."

* 2 Haggard, 377, 387.

We do not say that such a survey is indispensable. No doubt proof of the necessity and of the extent of the necessity may be otherwise made. But where the repairs alleged to be made are extensive, and the necessity otherwise left in doubt, the absence of such an examination will go far to warrant the conclusion that no real necessity existed.

The evidence in respect to the bills for supplies covered by the bottomry bond is not so strong as to the absence of necessity for them. But there are some items included in these bills, and particularly a very considerable item stated as a general balance found due on a former account of the consignee of the ship, which can hardly be regarded as subjects of bottomry.

Under these circumstances, if there were any proof affecting the lenders with actual knowledge of the facts, it would be our duty to pronounce the bottomry wholly invalid. For there is no evidence that they made any inquiry whatever, and the maritime law holds them to reasonable diligence in this respect.

But mere omission to make inquiry will not invalidate the bond altogether. It may be good in part and void in part. And where, as in this case, part of the repairs and supplies have been shown to be necessary, and there is no reason to impute fraud or collusion to the lenders, the bond, though void as to the items of which the necessity is disproved or not shown, may properly be held valid as to those items the necessity of which is shown.

Under the view which we have taken of this case it is not necessary to consider the evidence as to the necessity for credit. It may be of use, however, to observe that while there is evidence to show that the respondent, Law, was a man of large means, and known as such by some persons in Rio, the proof does not satisfy us that the sum named in the bond could have been raised on his credit at rates more advantageous than were actually obtained, much less that the lenders in this case could by any diligence of inquiry have learned that this might be done. It is matter of history, of which the court will take notice, that the year 1857 was

a year of financial revulsion and distress throughout the greater part, if not the whole, of the commercial world, the effects of which were still felt in the spring of 1858.   In such a time proof of the practicability of obtaining funds, in a port so remote, upon the credit of the owner, should be clear indeed in order to affect a lender upon bottomry with the duty of inquiry.

On the whole the decree of the Circuit Court must be REVERSED, and the cause must be remanded to that court with directions to refer the accounts for repairs and supplies to one or more commissioners experienced in commerce and of known intelligence and probity, to ascertain, under the instructions of the court, what portion of the repairs and supplies, actually furnished to the ship, were really necessary, and for the amount thus ascertained and approved by the court to enter

DECREE FOR THE LIBELLANTS.