## BERWIND and others *v.* SCHULTZ.[1]

*(District Court, S. D. New York. October 30, 1885.)*

1. **MARITIME LIEN—SUPPLIES—PRESUMPTION OF LIEN—BY WHAT REBUTTED.**

   The furnishing of supplies to a foreign vessel makes a *prima facie* case of lien. This presumption is rebutted by proof that the master or agent ordering the supplies had funds in hand sufficient to meet the bills incurred; that the material-man either had notice of these facts, or had knowledge of facts sufficient to put him on inquiry; and that reasonable inquiry or due diligence would have informed him of the fact that there were such funds and no need of credit.

2. **SAME—MATERIAL-MAN—INQUIRY AS TO FUNDS—STATEMENT.**

   S. & Co. were the regular agents in New York of the S. L. line of steam-ships, charged with attending to the New York business of the line, collecting inward freights, and paying bills. On their order, coal was furnished to the steam-ship K., one of the line, by libelants. There was no express reference made, on ordering the coal, to the owner of the steamer, and both parties expected payment to be made by S. & Co., and at that time S. & Co. had funds of the steamer in their hands sufficient to pay for the coal. No inquiries were made by libelant of S. & Co. as to the terms of their agency, the state of the ship's account, or as to the necessity of any credit. S. & Co. afterwards gave a check for the coal, post-dated, and libelant receipted the bill as paid, which receipt S. & Co. subsequently showed to the owner, asserting that the bill was paid, and on the faith of which the owner made an advance of $5,000 to S. & Co., which he testified he would not have done had he not supposed this bill was paid. The check not being paid at maturity, and the agency of the line being taken from S. & Co., and their credit becoming poor, libelant brought this action against the ship-owner, who claimed that he was not liable on account of the dealings between libelant and S. & Co. *Held*, that if the ship were liable, respondent, as owner, would also be liable; that the law requires of a material-man reasonable inquiry before presuming to charge the ship, whenever he knows that the person ordering the supplies is in receipt of funds on the ship's account. As S. & Co. had in their hands sufficient funds to pay for the coal, and intended to pay for it, and as reasonable inquiry on the part of libelant would have shown him that there was no need, and consequently no authority, for charging the ship, *held*, that the ship was not bound, so that the owner could not be held liable on the ground that the ship was lawfully charged.

3. **SAME—PRINCIPAL AND AGENT—SHIP-AGENTS—AUTHORITY TO CHARGE FOREIGN PRINCIPAL.**

   S. & Co. being the regular resident agents of the steam-ship, appointed by the foreign owner to conduct the general business of the ship in New York, and it not appearing that either by usage or by the terms of the agent's authority were the libelants precluded from charging the owner personally, *held*, that libelants did not sell the supplies exclusively on S. & Co.'s credit; and if the bill were not paid by S. & Co. within a reasonable time, libelants might lawfully resort to the principal. The English doctrine that, on a sale to the agent of a foreign constituent, the principal is not chargeable, is not applicable. The general rule stated. *The Sulote*, 23 Fed. Rep. 919, distinguished.

[1] Reported by R. D. & Edw. G. Benedict, Esqs., of the New York bar.

**4. SAME—EQUITABLE ESTOPPEL.**
But as libelants had delivered to S. & Co. the receipted bill, on the faith of which advances were made by the owner, which would not have been made but for this receipt, *held,* that these circumstances constituted an equitable estoppel that justly threw upon libelants the results of their own fault in giving a receipt without present payment, and therefore that the libel should be dismissed.

In Admiralty.

*Wilcox, Adams & Macklin,* for libelants.

*Jas. K. Hill, Wing & Shoudy* and *H. Putnam,* for respondent.

BROWN, J. The libelant seeks to recover of the respondent the sum of $1,472.50 for coal furnished to the steamer Katie at New York, in September, 1884. The respondent contends that the libelants are precluded from any claim on him in consequence of their dealings with Slocovich & Co., the ship's agents, who ordered the coal, and whose check they received in payment.

The case presents questions not unfrequently arising in this port under dealings with resident "ship-agents," so called, appointed by the foreign owners; and as the legal character of these special agents, and their relation to the ship and to her owners, are not defined in text-books, and are rarely specially alluded to in the reports, I shall state the facts of the case with some fullness.

The Katie was one of two steamers owned by the respondent, a resident of Stettin, Germany, which formed a regular line, known as the "Stettin Lloyds," plying between that port and New York; one steamer leaving New York every two weeks. Prior to March, 1884, the libelants had occasionally supplied coal to the steamers, through the orders of Wright & Co., who were then the ship's agents in New York, and by whom the ship's bills were paid. In the spring of 1884, Slocovich & Co. were substituted as agents in place of Wright & Co., with the powers and duties defined in the following letter:

"NEW YORK, March 14, 1884.

"*Messrs. Slocovich & Co., New York*—GENTLEMEN: With reference to the various conversations we had lately, I herewith agree to let you have the agency of my line,—Stettin Lloyd Co., H. S. Schultz, Stettin American Steamship Line,—between this port and Stettin, for this port, and I desire you to attend to all the business of these steamers, with the exception of the passenger department.

"You agreed to charge nothing for the collection of inward freights; and on the outward freight engaged by you I allow you 2½ per cent., and brokerages, so far as such have been actually paid. I rely, however, upon your using all discretion to make the brokerage as light on the vessels as possible.

"All discounts and drawbacks which might be allowed by people supplying the ships with stores of every kind, or by mechanics doing work for my ships, to be deducted from the bills, to the advantage of the line; and I look to you to also prevent your men and my employes to receive themselves profits which honestly ought to go to the ships. You will have to watch ship-chandlers, and other such people, and revise their prices and discounts from time to time. I have made agreements with some parties at present, but prices may decline, and ought always to be watched.

"Besides economy, dispatch is of the greatest importance; and the sailing days ought to be kept by all means, however, with as little extra expense as possible.

"All bills for the ship must be paid promptly, and receipted bills must accompany the account of each voyage as vouchers. In exceptional cases, where receipted bills cannot be sent, each case must be explained in full. As a rule, my ships bring freights larger than the New York expenses, when the surplus is to be sent as I may direct hereafter. In case when the freight does not cover the New York expenses, the stevedore's or some other such bill may be put off till the next voyage, or else you are at liberty to draw upon me at 30 days, in marks, on Stettin, or in £M, *payable* with the Union Bank of London, London.

"I cannot give you any definite, binding instructions as to the rates and the general management of my ships, but must entirely rely upon your using every exertion to secure the best freights for me you can. For further details I refer to a letter to Mess. Simpson, Spence & Young herewith, which please peruse and have copied.

"My telegram address is Lloyd, Stettin. Arrival and departure of every steamer is to be cabled, and, with the latter, the freight amount in £M aboard. Names of steamers need not be mentioned, because, as a rule, we will know that. * * *

"Trusting that our business connection thus formed may be a lasting one, and turn out to our entire satisfaction, I am, gentlemen,

"Yours, very truly,                    STETTIN LLOYD CO.
                                       "H. S. SCHULTZ."

As an inducement to transfer the agency to them, Slocovich & Co. had agreed to make to the respondent, during the agency, a standing loan of $10,000, secured by insurance on one of the ships. This loan was made in the form of four notes of Slocovich & Co. at three, six, nine, and twelve months, for $2,500 each, two of which, amounting to $5,000, Slocovich & Co. paid at maturity, in June and September, 1884. They had also accepted a further accommodation draft drawn on them by the respondent for $1,785. But these dealings were, as I find, wholly outside of the ship's accounts, and not intended to enter into them in any way. They have no bearing, therefore, upon the first material question in this case, viz., to whom must the credit for the coal be held to have been given?

The coal was ordered by Slocovich & Co. for one of the regular trips of the Katie. It was delivered to the steamer on September 13, 1884, and a bill rendered to Slocovich & Co., amounting to $1,520, headed "Dr. Steamer Katie & Owners." No supplies had been previously furnished by the libelants to either steamer of the line since Slocovich & Co. had acted as agents. But a week after the substitution of Slocovich & Co. in place of Wright & Co., the libelants, by letter of March 21st, addressed to the respondent, requested him to "continue favoring us with your orders as heretofore." No reply was made by the respondent. The Katie sailed about September 30th, and the agent's account of the voyage was rendered up to that date. This account contained some 42 debit items pertaining to that trip, represented to have been paid by Slocovich & Co., including the item of $1,520, for the coal in question; it stated the cred-

its from freights, and from advances received by Slocovich & Co., and concluded with a balance to the credit of the ship, after the charge for the coal as paid, of $20.64. Several demands were made by the libelants on Slocovich & Co. for payment, but when does not appear. On the thirteenth or fourteenth of November, the Katie again arrived in New York, with the respondent on board. The captain was soon after informed by the libelants that their bill of September had not been paid by Slocovich & Co., and the captain informed the respondent. On November 17th, the libelants' collector again called on Slocovich & Co. for payment, when the latter gave the collector a check post-dated November 24th, for the amount of the bill, less a deduction of 10 cents per ton, reducing the bill to $1,472.50, which the collector received in payment, and thereupon receipted the bill as paid. On the afternoon of the same day the respondent was in the office of Slocovich & Co., and was assured that the libelants' bill was paid, and that they had the voucher: whether the voucher was shown to him at that time or not, he is uncertain. It was given to him a few days afterwards. On the same afternoon of November 17th, supposing the bill paid, the respondent advanced to Slocovich & Co. £1,000, upon the master's draft, which he testified he should not have advanced had he not supposed the libelants' bill for coal had been paid, as was stated, and as appeared from the voucher. On the 24th, the check maturing on that day was protested for non-payment, and was duly returned to the libelants. On the following day the agency was taken from Slocovich & Co., and their credit has not since been considered good. On December 8th, Slocovich & Co. by letter requested the libelants to return to them their check of $1,472.50, as they had "credited Mr. Schultz that amount in general account," and "to apply to him for payment thereof." By letter of the same date they also notified Mr. Schultz that they had "credited him $1,472.50 in general account" for coal, and requested him "to pay the same to the libelants, as it was still due to them." On the 10th they again wrote to the libelants: "Mr. Schultz * * * having assumed to pay your bills against steamer Katie, you will please look to him for payment, as we have no funds in our hands belonging to the line." The respondent had not assumed to pay the bill, but, upon request by the libelant to pay, had refused to pay it, on the ground that he had paid it once already in Slocovich's accounts. Some lawsuits ensued between Slocovich & Co. and the respondent upon their respective demands, and those suits are still pending. The libelants did not return the check to Slocovich & Co. This libel was filed February 16, 1885. The check of Slocovich & Co. was produced by the libelants on the trial. The libelants, at the time of supplying the coal, made no inquiry whether Slocovich & Co. were in funds or not. The libelants testified that they knew Mr. Schultz before, and knew that he was owner; and that the credit was given to the ship and

owners, and not to Slocovich & Co. No demand on the captain or upon Mr. Schultz was made for payment, until some time after the protest of the check of Slocovich & Co.

Upon these facts it appears: (1) So far as respects the moneys appertaining to the ship's accounts, Slocovich & Co. had funds of the ship more than enough to pay for the coal. (2) The libelants knew that Slocovich & Co. were the ship's agents, charged with attending to her New York business, in collecting her inward freights, and paying her bills; and they knew that Mr. Schultz was the foreign owner. (3) They made no inquiries of the master or of the agents as to the particular terms of his agency, the state of the ship's accounts, or as to the necessity of any credit, so far as that might depend on funds in the agents' hands. (4) There is no reason to suppose that the facts would not have been ascertained upon inquiry of Slocovich & Co., or of the master of the ship. (5) The coal was ordered by Slocovich & Co. in their own names, with no express reference to Mr. Schultz, or to any responsibility of the ship or of her owners; and payment was expected by both parties to be made by Slocovich & Co.

If, upon the above facts, the ship would be liable, doubtless the owner would also be liable. So far as respects a lien on the ship, the case is not different in principle from that of *The Suliote*, 23 Fed. Rep. 919, although the excess of funds was there much greater; and it was there held that no lien existed on the ship. The furnishing of needed supplies to a foreign vessel does, indeed, make a *prima facie* case of lien; because, *prima facie*, in a foreign port, there is presumptively a need of credit to obtain them. But this presumption is only *prima facie*. It is rebutted by proof that the master or agent had funds in hand sufficient to meet the bills incurred, and that the material-man had either notice of the facts, or had knowledge of facts and circumstances sufficient to put him on inquiry, and that reasonable inquiry or due diligence would have informed him of the fact that there were such funds and no need of credit. Under such circumstances the master has no *authority* to charge the ship. It is consequently immaterial in such cases that the material-man supposed the ship was liable, or that he charged the ship upon his books, so long as neither the owner nor the agent did anything to lead him to rely on the ship. His doing so is in his own wrong.

The above rules have been so often laid down by the supreme court that repetition of them seems needless. I quote but a few passages only. In the last case in the supreme court in which the subject is referred to, (*Insurance Co.* v. *Baring,* 20 Wall. 159,) CLIFFORD, J., says (page 163) that the presumption of necessity for a credit of the ship prevails "unless it appears that the master had funds on hand, or at his command, which he ought to have applied, * * * and that the material-men knew that fact, or that *such facts and circumstances were known to them as were sufficient to put them upon inquiry,*

*and to show that if they had used due diligence they would have ascertained that the master had no authority to contract for such repairs and supplies on the credit of the vessel."*

In the next preceding case in which the subject is referred to, (*The Emily Souder*, 17 Wall. 666,) Mr. Justice FIELD, in delivering the judgment of the court, says (page 671) that the presumption above referred to "can be repelled only by clear and satisfactory proof that the master was in possession of funds applicable to the expenses, or of a credit of his own, or of the owners of his vessel, upon which funds could be raised by the exercise of reasonable diligence, and that the possession of such funds or credit was known to the party making the advances, *or could readily have been ascertained by proper inquiry.*"

In the case of *The Kalorama*, 10 Wall. 212, not long before, CLIFFORD, J., said:

"The *authority* of the master in such cases is implied from the *necessity* for the repairs or supplies, the *want of funds* for that purpose, and inability to procure the same, and the absence of the owner."

These observations are essentially the same that had already been repeatedly made in the cases of *The Grapeshot*, 9 Wall. 129, and *The Lulu*, 10 Wall. 192.

These qualifications of the master's authority, so often declared by the supreme court, are not legal fictions. They are substantial conditions and limitations of the master's authority, founded upon the soundest of reasons, to prevent claims of an implied hypothecation of vessels in circumstances where no need of it exists, and where, to uphold such liens, would afford temptations to fraud and to the injury of absent owners. All that this rule imposes on the material-man is reasonable inquiry, so as to avoid frauds on absent owners. *The Secret*, 3 Fed. Rep. 667; *The Washington Irving*, 2 Ben. 318. There is scarcely a modern maritime code that has not put some limitations upon the old rule of the civil law, that gave a lien on the ship for all contracts in her behalf and for her benefit.

The limitations of our law, so clearly laid down by the highest authority, must be fairly applied. They manifestly require of the material-man reasonable inquiry before presuming to charge the ship, whenever he knows that the person ordering the supplies is in receipt of funds on the ship's account. That was well known to the libelants in this case. It is implied in every case of resident agents of an established line. It is a part of the duty of such agents to collect all freights and pay all bills. The libelants knew that Slocovich & Co. were in the constant receipt of funds of the ship. They had in fact sufficient funds to pay for these supplies. They intended to pay for them, and not to create a burden upon the ship. Knowing that Slocovich & Co. were agents collecting the ship's funds, the libelants could not keep silence and lawfully charge the ship, when reasonable inquiry of the master or of Slocovich & Co. would have made known to them that there was no need, and hence no authority, for doing

so. The ship, therefore, was not bound; and the owners cannot be held liable upon the ground that the ship was lawfully charged.

2. Whether the owners are liable, although the ship was not, depends on the law of agency, and on the question whether Slocovich & Co. had authority to bind the owner; and whether it was the intent of the transaction that the owner should be bound.

In the case of *The Suliote, supra*, the agents were appointed by the master for a single and special occasion only, and had no authority beyond his. In this case the agents were appointed, not by the master, but by the owner, for the continuous and general agency of the line at this port, in respect to all the ship's ordinary business here. They were accountable to the owner only, and removable by him only. Within the limits of their agency, they were general agents, and had such authority as by usage belongs to that employment. By the general law of this country as well as of England, when general agents buy in their own names, but really for account of their principal, the seller has an option to look to either for payment; unless (1) he trusted the agent exclusively; or (2) by the usage and understanding of the business the agent only is held; or (3) unless the special circumstances of the case show that only the agent was intended to be bound, and the seller knew it, or was chargeable with knowledge of it. In ordinary commission business, by the law of England, where the agent buys in his own name for account of a *foreign principal*, under the long-settled usage and understanding in business, the agent only is bound. He is in fact the principal as respects the seller, and under the usage he has presumptively no authority to pledge his foreign principal's credit. This is also sustained by reason of the inconvenience of admitting privity of contract between him and the seller on all subcontracts. See citations in *The Suliote, supra;* Story, Ag. §§ 268, 433, 434; Whart. Ag. § 791. More than 50 years ago Lord TENTERDEN, in the case of *Thomson* v. *Davenport,* 9 Barn. & C. 78, 86, said this was the settled understanding of trade in such cases. In the recent case of *Maspons* v. *Mildred,* 9 Q. B. Div. 541, it is said that nearly all the continental codes contain provisions to the same effect. Such are section 381 of the recent Italian Code, section 119 of the Spanish Code, and section 78 of the Netherlands Code. Cases in which the principal was originally bound, and has remitted funds to the agent for payment, which have been misapplied, are not analogous. *Muldon* v. *Whitlock,* 1 Cow. 290, and cases there cited; *Keay* v. *Fenwick,* 1 C. P. Div. 745; *Davison* v. *Donaldson,* 9 Q. B. Div. 623.

In this country few cases have arisen that have directly presented the question for adjudication. It was referred to and discussed in *Kirkpatrick* v. *Stainer,* 22 Wend. 244, and in *Bray* v. *Kettell,* 1 Allen, 80; but as no usage of business in those cases appeared, the grounds of the English cases failed, and the general doctrine that the seller had an option to resort to either was maintained. See,

also, *Whitney* v. *Wyman*, 101 U. S. 392; *Oelricks* v. *Ford*, 23 How. 49, 64; 2 Kent, *630, note; *Taintor* v. *Prendergast*, 3 Hill, 72; *Barry* v. *Page*, 10 Gray, 398. The agent, buying in his own name, may undoubtedly keep the title to the property in himself, until some distinct act of appropriation to the principal's use. *The St. Joze Indiano*, 1 Wheat. 208, 213; *Farmers', etc., Bank* v. *Logan*, 74 N. Y. 568, 577; *McCulough* v. *Thompson*, 45 N. Y. Super. Ct. 449.

There are doubtless reasons of convenience, in the case of the owners of foreign steam-ship lines, quite as just and cogent as in other branches of business, why foreign principals might not wish to be held liable upon all the contracts of their agents here. The numerous bills incurred for the ship on every trip (there being over 30 in this instance) expose the ship to a liability to attachment at the instance of every dissatisfied creditor, if the foreign principal is held as debtor; and this, consequently, exposes her to the danger of more or less interruption and delay in her trips, when promptness and dispatch are of the first importance. The desire to avoid this liability, and the vexations attending it, might furnish a good reason for the appointment of local responsible agents of the ship, resident here, and designed to act as principals only, in their dealing with third persons. But whether that is the actual intent and understanding in the appointment of these local ship's agents, and whether there are any such legal limitations upon their authority, must depend upon the terms of their appointment, and on the general understanding in the business as affecting the seller with notice of these limitations.

No evidence was given in this case of any such limitation of the authority of the ship-agents, either according to any usage or by the understanding of business men in this port; and so far as I am aware, no such usage in this country has been shown in any similar case. The circumstances that usually attend the furnishing of regular steam-ship lines with supplies are in some respects different from the dealings with agents in most other kinds of business. The supplies are furnished and delivered to the ship herself, not to the agent. They are at once appropriated to the ship's use. The title to them cannot, like most other merchandise, be controlled by the agent for his own security. The frequent presence of the ship here furnishes also ample security to the material-men; so that they naturally look to the ship and owners as their ultimate security, though doubtless expecting payment through the agents. The almost universal habit of charging such supplies to the "ship and owners" accords with this view; though such an entry may be of little or no weight in particular cases, against other special indications of credit to the agent.

Nor does the letter of appointment and instructions in this case from Mr. Schultz to Slocovich & Co. indicate any clear intent to make Slocovich & Co. the only principals in contracts for supplies on the

ship's account, or to exclude any liability of his own. On the contrary, he says in one passage: "*I have made agreements* with some parties at present, but prices may decline, and ought always to be watched." The letter from the libelants directly to Mr. Schultz, requesting a continuance of his favors, shows the same understanding on the libelants' part. The passage relating to stevedore's bills rather indicates that the owner was contemplating his own liability to the stevedore. So far as the evidence shows, therefore, neither by usage, nor by the terms of the agents' authority, were the libelants precluded from charging the owner personally; and, upon the evidence of Mr. Slocovich and of the libelants, I must hold that they did not sell exclusively upon the agents' credit; and hence, if the bill were not paid within a reasonable time on demand upon the agents, the libelants might lawfully resort to the principal as bound by the original contract.

3. There is another feature in this case, however, that, upon the evidence, compels me to disallow any recovery from the respondent, viz., the delivery by the libelants of their receipted bill, on the seventeenth of November, to the agents, and the respondent's subsequent advance of $5,000 to the agents, in part, at least, upon the faith of this voucher. The respondent testifies that he would not have advanced this money had he not been assured by the agents that the bill was paid, and that they had this voucher, as they did in fact have it. Mr. Schultz's testimony on this point seems entirely probable from the circumstances, and is entitled to credit. Where the principal has "dealt differently with the agent," says Lord ELLENBOROUGH, in *Wyatt* v. *Marquis of Hertford*, 3 East, 147, "on the supposition that the demand had been satisfied, as the receipt imported, no doubt the defendant is discharged." This principle was followed and applied in *Cheever* v. *Smith*, 15 Johns. 276, and approved in *Muldon* v. *Whitlock*, 1 Cow. 290, 308, where the court say:

"If a man dealt with the agent of another in such a manner as to enable him to settle with his principal, and to receive from him a sum of money or other advantage which otherwise he would not have been able to obtain, and the principal does so settle with his agent, he will not afterwards be responsible upon the contract of his agent if he fail to pay." *The Active*, Olcott, 286; Story, Ag. § 434; Whart. Ag. § 219.

These circumstances constitute an equitable estoppel that justly throws upon the libelants the results of their own fault in giving a receipt without present payment, within the principle laid down in *Morgan* v. *Railroad Co.*, 96 U. S. 716, 723; *Merchants' Bank* v. *State Bank*, 10 Wall. 604. The above-cited cases are strictly applicable; and the libel must therefore be dismissed; but, under the circumstances, without costs.

For a full discussion of the subject of maritime liens see The De Smet, 10 Fed. Rep. ≈83, and note by Orlando F. Bump, 488 to 497.