## THE DORA.

MOORE *et al. v.* THE DORA.   HOPE INS. CO. *v.* SAME.   COSULICH *v.* SAME.

(*District Court, E. D. Louisiana.* May 25, 1887.)

1. SHIPPING—BOTTOMRY AND RESPONDENTIA—WHAT CONSTITUTES.

The master of a ship, having need of money in a foreign port, executed two instruments to secure loans, the tenor of which was that the master, for necessary disbursements of the vessel, pledged the vessel and freight for the payment of the amount expressed, to be made 10 days after the arrival of the vessel at the port of destination, any other draft or obligation to be secondary. Except by implication there was no renunciation of the claim for repayment of the loan, unless the ship arrived at her port of destination. *Held,* that these instruments had the force and validity of bottomry bonds.

2. SAME—RANK—AS BETWEEN BONDS ON SAME VESSEL.

In a question as to the rank of two bottomry bonds upon the same ship, the fact appeared to be that the obligations, though dated one one day, and the other the next day, were for moneys expended during the same period and to relieve the same necessity. *Held,* that since the priority must be determined according to the necessity at the time of the advances, and these advances were contemporaneous, and furnished relief from the same wants, the obligations must rank as of the same date.

3. SAME—ADVANCES BY SHIP'S AGENT FOR GENERAL AVERAGE.

A ship made jettison of part of her cargo, and upon her arrival in a foreign port was libeled and sold. *Held,* that the claims of the agents of the ship for money advanced in payment of her part of the general average should be paid out of the proceeds of the sale, before the bottomry bonds.

4. SAME—NATURE OF AGENTS' LIEN.

The lien of a ship's agents in a foreign port for money advanced in payment of her part of a general average arising out of a jettison of part of the cargo is a lien enforceable by a proceeding *in rem* in admiralty.

5. SAME—EXPENSES IN PREPARING SHIP FOR SALE.

A ship deviated from her course, and, after making jettison of part of her cargo, reached a foreign port. *Held* that, upon a libel and sale of the vessel, a claim of the ship's agents for money advanced for the preservation of the ship after she reached the harbor, and after she was condemned, to place her in a condition where she could be sold as a condemned vessel, should be first paid, before the bottomry bonds.

In Admiralty.

*E. W. Huntington,* for J. & C. Moore & Co.

*H. Denis,* for Hope Ins. Co. and claimants.

*T. J. Semmes,* for S. A. Cosulich.

BILLINGS, J.   These three causes, consolidated and tried as one, present the following state of facts:   On the 10th and 11th days of March, 1886, the Austrian ship Dora was at Pensacola, Fla., laden for a voyage to Genoa, Italy, with a cargo of lumber.   Having need of money for disbursements, and being without funds, the master, made and delivered two instruments,—the one, for 6,000 francs, on March 10th; and the other, for 617 pounds sterling, upon March 11th.   The tenor of these instruments was that the master, for necessary disbursements of the vessel, pledged the vessel and freight for the payment of the amount, ex-

pressed to be made 10 days after the arrival of the vessel at the port of destination, any other draft or obligation to be secondary. On March 14th the vessel set sail on her voyage, and proceeded to sea. She encountered rough weather, and sprung aleak. The master, after consultation with the other officers, to save the vessel and the residue of the cargo, caused a jettison to be made of a portion of the lumber, and, for safety of life, vessel, and cargo, determined to and did turn aside from his voyage, and seek New Orleans as a port of refuge, at which port she arrived on March 24th. On same day the Austrian consul appointed surveyors, who on 29th made an examination, and ordered cargo to be unladen, to allow of further survey. The cargo was unloaded between March 31st and April 22d. On April 29th the surveyors recommended that the vessel be condemned and sold. The master was about to have the vessel sold, when, on May 18th, the libel in the first of the causes was filed. Upon her arrival the vessel had been placed in the hands of J. A. Cosulich & Co., who had made the disbursements, and afterwards libeled her in the third suit. These libelants knew the owner of the vessel, and that he was a man of wealth. There is no other evidence that the disbursements were not made upon their reliance upon the vessel and the cargo for the amounts respectively required for them. Messrs. Cosuli... & Co. advanced in all the sum of $3,206.88. A general average was adjusted of the loss arising by the jettison, and the expenditures at this the port of refuge; and for the part of this loss and these expenditures, put by the adjustment upon the ship, claim is made by Cosulich & Co. upon the vessel and its proceeds. The vessel was sold, and brought $2,400, which is in the registry of the court. The questions are as to the validity and priority of these alleged claims upon the ship.

*First.* What is the character of those two hypothecations made at Pensacola? The proctors for those who hold them contend that they are bottomry instruments. Bottomry is defined to be a maritime contract by which a ship (or bottom) is hypothecated in security for money borrowed for the purposes of her voyage, under the condition that, if the ship arrive at the port of her destination, the borrower, personally, as well as the ship, shall be liable for the repayment of the loan, together with such premium thereon as may have been agreed on; but that, if the ship be lost, the lender shall have no claim against the borrower, either for the sum advanced or the premium, (which is often termed "maritime interest," since it may be fixed without necessary limit from the legal rate of interest in the country where the loan is made, or where it is to be paid.) The earlier bottomry contracts were executed under seal, and contained a special clause renouncing all claim for repayment of the loan, unless the ship arrived at her port of destination. The later usage has dispensed with the seal.

As to the absence of the old clause of renunciation of claim of repayment unless the ship arrived: In *Simonds* v. *Hodgson,* 3 Barn. & Adol. 50, the court of king's bench, presided over by Lord TENTERDEN, C. J., reversing the judgment of the common pleas, (6 Bing. 114,) held that where from the whole instrument it was manifest that the lender takes

upon himself the peril of the voyage, the instrument is one of bottomry. In *The Nelson*, 1 Hagg. Adm. 169, Lord STOWELL held that when the instrument simply provided that "the money was to be paid at a certain time after the arrival of the ship at her port;" that that was a sufficient description of a sea risk, and made the instrument one of bottomry. I consider it to be settled by authority that these instruments have the validity and force of bottomry bonds.

*Second.* As to their rank with reference to each other. The fact appears to be that those obligations, though dated one one day, and the other the next day, were for moneys expended during the same period, and to relieve the same necessity of the ship. In *The Virgin*, 8 Pet. 551, the court say, it is the practice to execute the bond after the money has been furnished on an agreement for a bottomry, as the precise amount cannot sooner be ascertained. It is settled law that the holder of a bottomry bond must show that there was a necessity for the hypothecation, and that a bottomry bond may be good for a portion of the loan, and bad for another portion. It would follow that the priority must be determined according to the necessity at the time of the advances, and, as the advances were contemporaneous, and for a single necessity, the obligations must rank as of the same date.

*Third.* There remains the question as to the rank of these bonds considered as one obligation, and the claims of Cosulich & Co. for their advances at this port. A study of the elements and grounds of the apportionment made by the adjusters shows this: That before the case came into the hands of the proctors for the ship's agents at this port, they had caused a general average to be made, to which the owners of the cargo had submitted, and their proportion of which they had paid. There is a further question as to expenditures in this port by the ship's agents, not included in the general average, amounting to $346.31. I shall first consider the question as if the lien upon the proceeds of the ship arose from a general average. The elements which make up the total which is apportioned are: $128.40, value of the cargo jettisoned; $193.34, the value of the yawl and tackle of the ship thrown overboard and destroyed to save cargo; and upwards of $6,000, expended by the ship's agents here. This total is apportioned upon cargo valued at $8,686.40, and one-half value of vessel, making $1,884.17. So that the chief question strictly is as to the right to enforce a lien against the bottomry obligations arising from expenditures made by the ship through its agents in a foreign port, a large portion of which has been satisfied by the owners of the cargo. As to the amount of the cargo jettisoned, the question is as to the validity and effect of a general average as against the bottomry holders. The general doctrine as laid down by the text writers, and as concurred in by the judges, is that money loaned upon bottomry is not affected by average or salvage. This language has led to some perplexity. In *Oologaardt* v. *The Anna*, in the United States district court in Rhode Island, reported in 9 Amer. Law Reg. (N. S.) 475, the court, after stating four reasons in favor of the claim of the libelants, which was for the enforcement of a claim for bottomry money against a general av-

erage, maintains libelant's claim. But I think it fair to infer that the court held that no general average could operate against bottomry. But this case stands alone as an express adjudication of that conclusion. In *Cargo ex Galam*, Brown & L. (1863-65) p. 184, the court interpreted this often-quoted maxim as to bottomry obligations not being liable to average, and held it was true only as between the owner of the thing hypothecated and the owner of the bottomry bond; but that, as between the holder of the bottomry bond and those whose lien arises in respect of services by which the thing hypothecated had been benefited, this maxim did not hold. This case maintained the lien arising from a general average for rescuing a portion of the cargo against the ship and rest of the cargo, as having a priority over a former *respondentia*. There can be no doubt but that this last decision is based upon a correct appreciation of the subject of maritime liens, and is correct. In *Cope* v. *Dock Co.*, 10 Fed. Rep. 142, 144, is given the reason for maritime liens upon ships, as follows:

"The ship and all things pertaining to it are, in the law of admiralty, so far as moneyed responsibility is concerned, clothed with personality. Those who repair her, or loan money upon her, or equip or man her, or who work for her, those who are injured by her, and those who save her, may look to her for judgment as the debtor. The reason for this is that ships are often distant far from home and their owners, and commerce was vastly facilitated, and the interest of all concerned therein vastly promoted, by their being endowed by law with the attributes or faculties of a personal debtor. This reason is the origin of the whole doctrine of maritime liens; and by this reason maritime liens are to be ascertained and measured and ranked."

Whoever lends money upon a bottomry obligation for the ordinary transactions of her voyage, has a lien upon the vessel which outranks all lienholders, save the mariners for their wages. But where maritime services or sacrifices or expenditures are rendered necessary which carry with them maritime liens, the holder of the bottomry bond, like any other mortgagee or pledgee, has his conditional interest burdened precisely as if he were to that extent an owner. Indeed, the bottomry holder can be no more than absolute owner, so far as third persons are concerned. To hold any more restricted doctrine would prejudice the interests of the bottomry holder himself. It is for his interest as well as for that of all other absolute or conditional owners that the whole should be saved by a sacrifice of a part, and that the whole thus saved should contribute to make good the sacrifice, and that salvors and all others who render benefits which save or render available the bottom pledged to him, should have a lien upon that bottom, even against him. See Williams & B. Adm. Jur. 64, 65; and Macl. Shipp. 702-705. I think that, upon reason and authority, the general average should be paid before the bottomry bonds. The transactions out of which the general average arose were subsequent to these bonds, and aided in providing and making available the bottom which these bonds contingently represented.

But it is urged by the learned proctors for the bottomry that the general average does not carry with it any maritime lien which can subject the ship to admiralty jurisdiction. It will be conceded that all jurists

have held that the general average carried with it a lien, either at common law or in admiralty. Those who, under certain circumstances, have denied that it constituted a privilege enforceable in the courts of admiralty have admitted that it gave a lien which was good in the common-law courts. This would be sufficient to dispose of this point in favor of the claimants as to the jettison and later disbursements. The three consolidated cases may be treated as one case initiated by the bottomry holders, and, the *res* being in the possession of the court, the lienholders other than those of an admiralty character might be decreed to be satisfied out of the *res* or its proceeds. This is the point decided in *The Lottawanna*, 21 Wall. 558, 581, 582. But the weight of authority is in favor of the general average in this case carrying with it such a lien as would of itself give and maintain admiralty jurisdiction. It would be idle to review all the cases in which the question has been passed upon. It may be said that in England this lien is treated as purely of a common-law character; while the weight of American authorities is decidedly in favor of its carrying an admiralty lien capable of being enforced in a proceeding *in rem* in a court of admiralty. Nor is it necessary to examine the earlier decisions in the United States supreme court bearing upon this subject, because this precise question was presented to that court in *Nemours* v. *Vance*, 19 How. 162, 171. It was there held that the owner of a cargo jettisoned has a maritime lien on the vessel for the contributory share due from the vessel on an adjustment of a general average, which lien may be enforced by a proceeding *in rem* in the admiralty.

Lastly, as to the claim of Cosulich & Co. for the $362 expended by them as the ship's agents, after she was brought into this port, and which was not included in the general average. For the most part, or to the extent of a great part, these expenditures were made for the preservation of the ship, and, after she was condemned, to place her in a condition where she could be sold as a condemned vessel. They were therefore expenditures made in a foreign port, which tended directly to enable the bottomry-men to realize out of the vessel in a port where she had to be sold. Those which are valid against the ship rank before the bottomry holders, precisely as would the expenses of an auctioneer in making the sale; they were a necessity or there could have been no realizing out of the vessel for the bondholder. There is a series of cases in which the supreme court of the United States have defined the liens of those who expend moneys upon ships in foreign parts, which, in their own language, have "had the effect to place these liens upon a more substantial footing." Those decisions maintain the general doctrine that expenditure which benefits the *res* creates a lien. These cases are *The Grape-Shot*, 9 Wall. 129; *The Lulu*, 10 Wall. 192; *The Patapsco*, 13 Wall. 329; *The Emily Souder*, 17 Wall. 666. Those cases also dispose of the point taken that, because the parties making the expenditures know the owners, and know them to be persons of wealth, that therefore they gave the credit to the owners, and not to the ship; for they hold, among other propositions, (*Patapsco*, 13 Wall. 334,) that the burden of displacing the lien

from the vessel, where expenditures were necessary, was upon the claimants. In that case the charge upon the books of the libelants was against the owner personally, and still the court held the credit was given to the vessel. The conclusion is that Cosulich & Co. must first be paid the amount adjusted by the general average as the contributory share of the vessel's loss and expense, viz., $1,308.40, and for such portion of the expenditures of $346 as were necessary in order to preserve the vessel, (and to ascertain these items there may be a reference.) The balance of the proceeds must go to the holders of the two bottomry obligations *pro rata.*