## THE PRESIDENT.

(District Court, N. D. California. January 23, 1899.)

### No. 11,410.

1. SHIPPING—CARRIAGE OF PASSENGERS—CONSTRUCTION OF CONTRACT.
   A vessel which contracts to carry passengers to a port, where they are to procure boats to land themselves and their stores, is bound, on reaching such port, to remain a reasonable length of time to enable the passengers to procure boats and to make their landing, and is only excused from so remaining by act of God or the public enemies.

2. SAME—FARE FURNISHED PASSENGERS.
   Where the fare furnished passengers on a long sea voyage is such as is usually provided, and is sufficient in quantity, and properly cooked, and the passengers do not really suffer, they have no ground for the recovery of damages because it is not so good as might have been furnished, or as is provided on vessels making short voyages.

3. DAMAGES—BREACH OF CONTRACT OF CARRIAGE.
   In an action against a vessel for damages by reason of a failure to afford passengers an opportunity to land on reaching their port of destination, and their carriage to a distant port, the measure of recovery is the actual damage sustained, which includes the fare paid, and, where the passenger returns to the port at which he took passage, the cost of

such return, together with a reasonable sum as compensation for the loss of time necessarily resulting from the breach of the contract.

This was a libel by Benjamin F. Gray and others against the steamship President to recover damages for breach of contract to carry libelants as passengers, and for alleged mistreatment on the voyage.

Page, McCutchen & Eells and W. H. Payson, for libelants.

Chickering, Thomas & Gregory and Andros & Frank, for claimant.

DE HAVEN, District Judge. This action is one to recover damages for the alleged breach of an agreement to transport the libelants on the steamship President from St. Michaels, in the territory of Alaska, to Unalaklik, in the same territory. The libel alleges that in pursuance of their agreement for such passage the libelants went on board the President at St. Michaels, proceeding thence on the voyage to Unalaklik; that, when the latter place was reached, the master of the steamer refused to land the libelants or their stores, and, against their protests, carried them to San Francisco. It is further alleged that the master used towards them during the voyage to San Francisco profane and intemperate language; that, owing to the crowded condition of the steamer and lack of preparation for such a voyage, the libelants were not given proper accommodation or food, and by reason thereof "suffered great inconvenience and discomfort on the said voyage." Each of the libelants claims damages in the sum of $2,000. The claimant, in its answer, admits that the libelants took passage on the President on her voyage between St. Michaels and Unalaklik on October 19, 1897; and in this connection it is alleged "that it was then and there further understood and agreed by and between the master and said libelants that the service so contracted for as aforesaid was to be limited to transporting said libelants to a point off the beach at Unalaklik, where it would be safe for said steamer to lie, and that said libelants agreed themselves to provide the means for and secure a landing at said point; and the master of said vessel did not agree to land any of said libelants, or any of their said stores, but then and there expressly stated to them that he would not, and it was then and there mutually agreed that he should not, guaranty said libelants a landing at said point"; and as a defense to the action it is alleged that on the morning the President left Unalaklik for San Francisco, in attempting to raise her anchor the winch used for that purpose broke, and became useless, so as to render it impossible to again bring the vessel to anchor; that the weather was stormy, rendering it impossible to make the land without imminent danger of wrecking the vessel and losing the lives of those on board; that in its disabled condition, and in the then state of the weather, it was impossible for the steamer to make St. Michaels, or any other place in Alaska; "that the season of navigation in the Behring Sea was then about to close, and that the safety of the ship and the lives of those on board rendered it imperative to put to sea; that the port of San Francisco was the most available port for the safety and best interests of all concerned." The answer denied that the master of the President used towards the libelants profane and

intemperate language during the voyage to San Francisco, and also contained a denial of the further allegation of the libel that he failed to provide them with proper food and accommodation. There is no substantial conflict in the oral evidence as to the terms of the contract between the libelants and the master of the President. The contract was that in consideration of the sum of $15, paid by each, and labor performed by them in assisting to discharge the cargo of the President at St. Michaels, the libelants, with their stores, were to be carried by that steamer from St. Michaels to Unalaklik, and upon arrival there they were to procure, at their own expense, boats properly manned, and assist the boats belonging to the steamer in landing themselves and stores. In fulfillment of this agreement the libelants were taken on board the President at St. Michaels, the steamer leaving there on the morning of October 19, 1897, and arriving at a point about two miles off the shore at Unalaklik early in the afternoon of the same day, where the steamer was anchored. Several of the libelants then went on shore, and made arrangements with the natives to assist with their skin boats in landing libelants and their property, and they also brought with them, upon returning to the steamer on the same afternoon, a whaleboat to be used for the same purpose. One small load of freight was also taken ashore by a skin boat, and it then being near dark and the tide too low for loaded boats to reach the beach, the master of the President determined to wait until the next morning before further attempting to discharge the freight belonging to libelants. The whaleboat was then taken on board, and the steamer moved further from shore, to what was deemed a safer place of anchorage for the night. In raising the anchor on the following morning, a reversing link, part of the steam winch used for raising and dropping the anchor, was broken. The anchor was, however, after some delay and difficulty, raised, and the steamer then ran to within three or four miles of the shore, blowing her whistle from time to time as a signal to those on the shore to come out. The interval between the first and the last whistle was about half an hour; and, no boats having come from the shore, the whaleboat was launched and anchored, and the President immediately, and without the consent of libelants, steamed for the port of San Francisco, without giving them any further opportunity to land with their stores at Unalaklik.

The question for decision is whether the refusal of the master of the President to longer remain off Unalaklik, and the carrying of libelants to the port of San Francisco, was a breach of the agreement above stated. The libelants were entitled to a reasonable opportunity to land with their stores at the place of destination. The fact that it was also provided by the agreement that they were to procure at Unalaklik boats to assist in the landing, did not, in the least, release the President from its obligation to lay off Unalaklik a reasonable length of time so as to permit the landing of the libelants and their stores in the manner contemplated by the contract. The undertaking on the part of the master of the President was an absolute one to carry the libelants to Unalaklik, and to remain there a reasonable length of time for the purpose of giving the libelants

an opportunity to disembark with their stores, and the nonperformance of such an agreement can only be excused by the "act of God" or "public enemies." There is, of course, an implied condition in a contract of this character that human life shall not be put in imminent peril in its performance. If the condition of the wind and sea on the morning of October 20th was such that it was not possible to land the libelants without exposing them to extreme danger, or if it was apparent, in view of all the surrounding circumstances, that longer to remain in the vicinity of Unalaklik would endanger the safety of the vessel and the lives of those on board, the master of the President was justified in not longer remaining, and the burden of proving that there was such apparent danger is upon the claimant. Upon the trial of this action the master testified, in substance, that on the morning the President left Unalaklik, the wind was blowing with a velocity of 25 or 30 miles an hour; that the sea was so rough that it would not have been possible to have landed the libelants; that the weather was extremely cold, and ice was forming around the vessel; that under these circumstances, and in view of the fact that the winch used in operating the anchor was disabled, the vessel could not safely remain longer off Unalaklik; that, as the season for navigation in that latitude was about to close, and ice was liable to form at any time, it was imperatively necessary for the President at once, and without any delay whatever, to steam for San Francisco. The testimony of the master is corroborated by the engineer and the first officer of the President, and by other witnesses. On the other hand, those of the libelants who were witnesses, and several other persons who were passengers on board the President, and who are not parties to this action, testified that on the morning the President left for San Francisco there was nothing to prevent the landing of the libelants at Unalaklik; that, while the weather was cold, and a strong breeze blowing, the sea was not much, if any, rougher than upon the previous afternoon, when small boats passed between the steamer and the shore without difficulty. Upon questions like those arising here, as to whether the wind was blowing a gale or only a strong breeze, or whether the ocean was very rough or otherwise, the testimony of a seafaring witness is not entitled to any greater weight than that of any other person who has reached years of discretion, and who has observed the sea in different kinds of weather. Certainly any person of ordinary judgment and observation who was on the President when she left Unalaklik, and on the day before, is competent to say whether the sea on the morning of leaving Unalaklik was rougher than on the previous afternoon, when small boats passed between the steamer and the shore, and such a person would be able to form some opinion whether boats from the shore could have succeeded in reaching the steamer and taking passengers therefrom on the day in question. The fact, also, that a whaleboat was launched without difficulty just as the President was leaving Unalaklik tends very strongly to show that the opinion of these witnesses that it was possible to have landed without danger is correct; so, also, the fact that some of the libelants requested the captain to remain for a few minutes longer so as to give the boats time to come

from shore, if there was any intention upon the part of the natives to come out, tends strongly to show that the sea was not so rough as to impress such libelants with a feeling that they would have incurred great personal danger in attempting to land at that time. After giving careful consideration to the conflicting evidence, I have reached the conclusion that it was possible for the libelants to have landed at Unalaklik, without danger to themselves, if reasonable opportunity had been given therefor. I am entirely satisfied from the evidence that the injury to the winch was one which could have been easily repaired, and there was nothing in the situation or circumstances surrounding the President to justify her master, under the law as I have stated it, in leaving Unalaklik without giving libelants sufficient time to ascertain whether boats were coming out to land them and their stores. The opinion of the master that the safety of the vessel and the lives of those on board imperatively required that he should take the action he did is not conclusive, and constitutes no defense to an action for the breach of his contract. The evidence must be sufficient to show that such opinion was a reasonable one, in view of all the circumstances then surrounding him.

The allegations of the libel charging the master with improper treatment of the libelants in the use towards them of profane and intemperate language, and in failing to provide them with proper accommodations and food during the voyage, are not, in my judgment, sustained by the evidence. The food was such as is usually furnished on long sea voyages, and was sufficient in quantity, and properly cooked. It was not so good, or served so well, as on passenger steamers making shorter voyages; but this fact is not ground for damages. To adopt the language of Lord Denman, C. J., in Young v. Fewson, 8 Car. & P. 55:

"There is no real ground of complaint, no right of action, unless the plaintiff has really been a sufferer; for it is not because a man does not get so good a dinner as he might have had that he is therefore to have a right of action against the captain who does not provide all that he ought. You must be satisfied that there was a real grievance sustained by the plaintiff."

Upon the question of damages, the recovery must be limited to the actual loss sustained by the libelants in consequence of the breach of the contract. This will include the value of their services in assisting to discharge the President at St. Michaels, and the amount paid by them for transportation to Unalaklik; also a reasonable sum by way of compensation for the loss of time consumed on the voyage from Unalaklik to San Francisco. Such of them as have returned to Alaska are entitled to recover, in addition, the expense of transportation from San Francisco to St. Michaels, and a reasonable sum for the loss of time consumed on the return voyage. There is evidence showing that some of the libelants sustained damages by reason of the loss of a portion of their stores left on the beach at Unalaklik, and stores damaged by water on the voyage from Unalaklik to San Francisco. The libel makes no claim for such damages, but the libelants will be permitted to amend the libel in this respect, and the case will be referred to United States Commissioner Manley to report on the evidence already taken, and such

further testimony as may be presented, the amount of damages sustained by the respective libelants; the report to show each item of damage allowed.