## UNITED STATES v. HOLLAND-AMERICA LINE.

(District Court, S. D. New York. May 16, 1913.)

1. ALIENS (§ 53*)—IMMIGRATION ACT—CONSTRUCTION—"LANDING."

In the provision of Immigration Act Feb. 20, 1907, c. 1134, § 16, 34 Stat. 903 (U. S. Comp. St. Supp. 1911, p. 508) that the temporary removal of aliens from the vessel for examination "shall not be considered a landing," the word "landing" is used as denoting an act equivalent to a lawful entry.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112; Dec. Dig. § 53.*

For other definitions, see Words and Phrases, vol. 5, pp. 3987, 3988.]

2. ALIENS (§ 53*)—IMMIGRATION—LIABILITY OF CARRIERS.

A steamship company which brings alien immigrants to the United States in its vessels cannot be held liable under Immigration Act Feb. 20, 1907, c. 1134, 34 Stat. 898 (U. S. Comp. St. Supp. 1911, p. 499), for the expense of medical and hospital treatment given to such aliens who are finally admitted, but who, owing to having contagious diseases either themselves or in their families, must be cared for and the diseased ones cured before they can be properly examined as to their right to entry; but such expense is properly payable from the "immigrant fund" created by such act or from the appropriation for "enforcement of the laws regulating the immigration of aliens" made by Act March 4, 1909, c. 299, §

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

1, 35 Stat. 982 (U. S. Comp. St. Supp. 1911, p. 521), and subsequent appropriation acts.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112; Dec. Dig. § 53.*]

3. CONTRACTS (§ 95*)—IMMIGRATION—LIABILITY OF CARRIER—DURESS.

An agreement by a steamship company to pay the hospital expenses of immigrant passengers suffering from contagious diseases on their arrival, induced by threats of the immigration officers to otherwise detain such passengers on the vessel until their recovery was made practically under duress, and being for something for which the company was not legally liable, was without consideration and cannot be enforced by the government.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 431–440; Dec. Dig. § 95.*]

Action by the United States against Holland-America Line. Judgment for defendant.

Henry A. Wise, U. S. Atty., and Addison S. Pratt, Asst. U. S. Atty., both of New York City.

Lucius H. Beers, of New York City, for defendant.

MAYER, District Judge. This action is submitted upon an agreed statement of facts, setting forth a mass of detail which need not be recited at length.

The basic facts necessary to a decision may be briefly outlined.

The action was brought to recover the sum of $2,167.80 admitted to be the actual cost and reasonable value of the maintenance and medical care and treatment furnished by the plaintiff to a number of aliens (enumerated in Exhibits A and B attached to the complaint), who had been brought to the United States by the defendant upon its steamers and who, at the time of arrival, were found to be suffering from the respective diseases set opposite their names in the above referred to exhibits. Because of the fact that the aliens were suffering from these diseases it was impracticable for the immigration authorities to examine them at the times of their respective arrivals for the purpose of ascertaining whether or not they were clearly and beyond a doubt, entitled to land. In the opinion of the immigration authorities, it was necessary to hold these aliens for such examination until they had so far recovered from the diseases with which they were afflicted that it would be possible, not only from the point of view of the government, but also from the point of view of the aliens themselves, and for humanitarian reasons, to examine them.

A few aliens were also detained, although not themselves afflicted with any diseases, for the reason that they were accompanying some diseased alien and stood in such a relation to the diseased alien by reason of being either the parent or child or some member of the family of the diseased alien that, as a matter of decent treatment and humanity or for the proper care of the diseased alien, it was necessary that the alien accompanying him or her should also be temporarily placed in the hospital as a suitable attendant for the diseased alien, or the reverse.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

The aliens mentioned in Exhibit A who, upon arrival, were afflicted with minor contagious diseases, such as measles, and scarlet fever, were removed from the vessel to hospitals in the cities of New York and Hoboken; there being no accommodations at Ellis Island at that time for the care of aliens afflicted with such contagious diseases. When these aliens were cured or discharged from the hospitals, prior to which time it was not possible for them to appear for examination before the immigrant inspectors, they were taken to Ellis Island for examination as to their right to land and were admitted. The hospital bills for the care of the aliens mentioned in Exhibit A were paid by the plaintiff.

The aliens mentioned in Exhibit B were, upon arrival, removed with other aliens, from the vessel to the Ellis Island immigrant station for examination, and, upon being there examined by the medical officers, they were found to be afflicted with the various diseases mentioned and were placed in the Ellis Island hospital for medical care and treatment. Upon being discharged from the hospital they were examined by the immigration officers in regard to their right to land and were admitted.

The items making up the sum sought to be recovered are for medical services and treatment rendered to the aliens mentioned in Exhibits A and B between the time of their arrival and the time when they were examined by the immigration officials to determine their right to land. The aliens for whom these charges were incurred were brought by the defendant for hire from Europe to the Port of New York, between March, 1909, and October, 1909. Upon arrival at the Port of New York, of the respective vessels, upon which these aliens were passengers, the Commissioner of Immigration at Ellis Island Immigration Station, New York Harbor, detailed immigrant inspectors and also the proper medical officers to board them. The aliens who traveled as first and second cabin passengers were inspected on board the vessels by the immigrant inspectors and medical officers, and, if found by them to be free from contagious disease and to be clearly and beyond doubt entitled to land, they were permitted to land at the docks and enter the United States. The masters of the vessels were ordered by the immigration inspectors to remove temporarily all those who did not appear to be clearly and beyond a doubt entitled to land to Ellis Island for further examination, and they were so removed as so ordered. The masters of the vessels were also ordered to remove temporarily all those who were found to be suffering from contagious diseases to public hospitals. The aliens who traveled as steerage passengers were (except where suffering from contagious diseases and sent to hospitals) temporarily removed from the docks to Ellis Island and were there inspected and examined by the immigration inspectors and medical officers. In other words, the method of procedure, at this port, has been that, except in the case of an alien suffering from a contagious disease, or perhaps an "accompanying" alien in certain cases, only steerage passengers were taken to Ellis Island, while first and second cabin passengers were permitted to land at the docks without first being taken to Ellis Island.

205 F.—60

The liability of the defendant has been the subject-matter of controversy and discussion for over 20 years, and numerous opinions have been written and actions taken by the administrative authorities.

The complaint states two causes of action; the first based, as the plaintiff claims, upon the Immigration Act itself, and the second upon a contract whereby the defendant agreed to pay the expense under consideration. No question arises as to the cases where diseased aliens have been ultimately excluded. The dispute relates solely to those cases where the alien has been ultimately admitted.

In support of the first cause of action, the government is unable to point to any specific authority in the statute for requiring the defendant to pay these charges, and relies fundamentally upon the proposition that the alien theoretically never left the vessel, and therefore that the defendant is liable for maintenance and medical treatment. To fortify its theory the government invokes the aid of the practical construction which it urges has been placed upon the statute by the administrative authorities.

As to the second cause of action, the government contends that it could have forced the examination and retention of the aliens upon the vessels, and that when the defendant, to avoid such a course, agreed to pay charges of this character, such agreement had the dignity of an enforceable contract.

To understand properly the legislative intent, a survey must be had of the whole statute. Numerous acts relating to immigration have been passed by Congress, the latest of which, as affecting the main points of this controversy, was the act of February 20, 1907, which repealed the act of March 3, 1903, and various prior acts or parts of acts, inconsistent with the new law.

The act of 1907 specifies with great care the cases or instances which impose obligations or penalties upon the steamship companies. Thus, section 19 provides that all aliens brought to this country "in violation of law" shall be deported on the vessel bringing them, and that the cost of their maintenance while on land, as well as the expense of the return of such aliens, shall be borne by the owner of the vessel. The act will be searched in vain for any provision which imposes expense upon the owners of vessels where there has not been neglect or a violation of law. It would not have been strange if the owner of a vessel had been required to bear the expense of the maintenance of aliens in certain circumstances where it might well have been said that a further detention of the alien was the proximate result caused by bringing him into the country in violation of law. Thus, in this same section 19 it is provided that the deportation of an alien may be suspended if, in the judgment of the Commissioner General of Immigration, the testimony of such alien is necessary on behalf of the United States government in the prosecution of offenders against any provision of the act; and, again, it is provided in the case of an insane alien that, if it be certified by proper authority that his health or safety would be unduly imperiled by immediate deportation, such alien may be held for treatment until such time as such alien may, in the opinion of an official medical officer, be safely deported. But in both

these instances the expense of maintenance is not charged against the steamship companies, but against the "Immigrant Fund."

In section 20, where any alien has actually entered the United States "in violation of law, and such as become public charges for causes existing prior to landing," must be deported to the country whence he came at any time within three years after the date of his entry into the United States. The steamship company which has brought to this country such an alien is required to contribute to the expense of his deportation by carrying the passenger back after he is brought to the coast. Under the act of 1903 the steamship company was also required to pay one-half the cost of the inland transportation; but, when Congress came to examine the Immigration Act of 1903, for the purpose of framing the act of 1907, it concluded that one-half of the cost of inland transportation was to be borne by the "contractor, procurer, or other person by whom the alien was unlawfully induced to enter the United States, or, if that cannot be done, then the cost of removal to the port of deportation shall be at the expense of the immigrant fund."

The Committee of the House reporting on the new form of section 20 (Fifty-Ninth Congress, first session, report No. 4,912) pointed out that it would be unjust to visit the expense of inland transportation upon the steamship companies and that, in cases of this character, the cost should be borne by the real offenders, and, if that was impracticable, then by the immigrant fund.

The theory of section 20 evidently was that in such cases the steamship companies had not been remiss, and, therefore should not be penalized beyond the expense of deporting the alien from the point of embarkation; and this theory as to imposition of charges and expenses is to be found in every detail of the statute.

As far back as the act of 1882, Congress provided for a head money tax of 50 cents for every alien entering the United States. This tax has been increased from time to time until it is now $4.

In section 1 of the act of 1882, it was provided:

"The money thus collected shall be paid into the United States Treasury, and shall constitute a fund to be called the immigrant fund, and shall be used, under the direction of the Secretary of the Treasury, to defray the expense of regulating immigration under this act, and for the care of immigrants arriving in the United States, for the relief of such as are in distress, and for the general purposes and expenses of carrying this act into effect." Act Aug. 3, 1882, c. 376, 22 Stat. 214 (U. S. Comp. St. 1901, p. 1288).

This provision remained unchanged until the passage of the act of 1903 (Act March 3, 1903, c. 1012, 32 Stat. 1213), when the language was changed to read as follows:

"The money thus collected shall be paid into the United States Treasury and shall constitute a permanent appropriation to be called 'the Immigrant Fund,' to be used under the direction of the Secretary of the Treasury, to defray the expense of regulating the immigration of aliens into the United States under this act, including the cost of reports of decisions of the federal courts, and digests thereof, for the use of the Commissioner General of Immigration, and the salaries and expenses of all officers, clerks, and employés appointed for the purpose of enforcing the provisions of this act."

This provision was retained in section 1 of the act of 1907, without any material change.

The act of March 4, 1909, provided:

"That on and after July 1, 1909, all head taxes collected pursuant to the provisions of section 1 of the said act of February 20, 1907, together with all fines, rentals collected, and moneys received from other sources under the laws regulating the immigration of aliens into the United States, shall be covered into the Treasury to the credit of miscellaneous receipts."

By this same act an appropriation of $2,400,000 was made—

"for all expenses of the enforcement of the laws regulating the immigration of aliens into the United States, including the Contract Labor Laws; for the costs of the reports of decisions of the federal courts, and digests thereof, for the use of the Commissioner General of Immigration; for salaries and expenses of all officers, clerks, and employés appointed to enforce said laws; for the enforcement of the provisions of the act of February 20, 1907, entitled 'An act to regulate the immigration of aliens into the United States'; * * * for expenses of necessary supplies, alterations, and repairs, and for all other expenses authorized by said act; * * * all to be expended under the direction of the Secretary of Commerce and Labor." 35 Stat. 981.

Similar appropriations have been made in the succeeding annual appropriation acts.

It will be noted while, for a considerable period, this immigrant fund was to be used under the direction of the Secretary of the Treasury, that the act of March 4, 1909, covered the head taxes into the treasury to the credit of miscellaneous receipts. This change in 1909 did not affect the reasons for the collection of the tax or the purposes to which the tax was to be devoted, but merely placed appropriations, in the first instance, under the control of Congress instead of the Secretary of the Treasury. It will be noted that the immigration acts passed from time to time are entitled "An act to regulate the immigration .of aliens into the United States."

As was pointed out in the Head Money Cases, 112 U. S. at page 595, 5 Sup. Ct. 247, 28 L. Ed. ·798, the title of the act was well chosen. The act of 1907 confided, as did its predecessors, a large measure of discretion in the way of practical administration, to the officials charged with its enforcement, leaving to their judgment much that cannot be provided for in detail in a statute dealing with a subject so comprehensive. When the immigrant fund was created and the appropriate official of the government authorized to "defray the expense of regulating immigration under this act," it is apparent that Congress realized that various situations of practical administration would arise and would cause expense, and therefore, in this broad clause, authority was given to utilize this fund for such proper .purposes.

Congress has placed its own interpretation upon the fundamental theory of this immigrant fund raised as it is, not from the citizens of the United States, but from the aliens entering, and, thus, out of this fund buildings have been erected, expenses of a commission to investigate immigration have been paid, and, in brief, sums have been expended for purposes of all kinds which may be considered broadly as relating to the regulation of immigration. To determine whether an alien is entitled to admission and, to that end, to detain him until he is

fit for examination, is surely as germane to the regulation of immigration as is the erection of a suitable building in which temporarily to house the alien.

But it is contended by the government that the omission of the words "and for the care of immigrants arriving in the United States, for the relief of such as are in distress" (section 1 of the act of 1882), in the act of 1903 and in the act of 1907, has some significance.

Clearly the care of immigrants and their relief referred to those who had entered the United States, and such was the construction placed on this statute by Secretary Windom in 1891 (Exhibit 3, dated January 17, 1891).

It is not clear why this phrase was omitted in the act of 1903, but I think too much emphasis must not be laid upon that omission.

It may very well be that Congress thought that the broad phrase "the expense of regulating" immigration was sufficient to authorize the expenditure of funds for the care of immigrants and the relief of those in distress, and, under section 22 of the act, specific authority is conferred upon the appropriate official "to enter into contract for support and relief of such aliens as may *fall* into distress or need public aid."

It is also insisted that the provision as to including the cost of reports of decisions of the federal courts, and digests thereof, and the salary and expenses of officials and employés appointed to enforce the act, indicates that Congress was careful to enumerate and particularize the purposes for which the immigrant fund was to be used.

The reason, however, for this detail seems clear. In the absence of a provision to that effect, it might very well have been questioned whether the purchase of law books and the payment of the salaries of public officials could be regarded as a regulation of immigration. But, if the various steps necessary to determine whether an alien may enter or be excluded from the United States is not (without further definition) a regulation of immigration, then I fail to understand what is.

It is, of course, well known that departmental appropriations are based, to some extent, upon departmental budgets, and, if the act of March 4, 1909, did not appropriate money to pay expenses of the character here discussed, that fact does not affect the interpretation of the statute.

At that time, the defendant company had been forced into paying and agreeing to pay these expenses of maintenance, and, if the appropriation was deficient, the reason therefor is apparent. It is admitted that there were ample moneys in the immigrant fund to pay these expenses, and it is within the power of Congress at any time to make such fiscal provision as it may deem proper.

Failing, therefore, to find any warrant for its position in the statute, the government insists that it could have compelled the defendant to detain these aliens on its vessels, and it bases this insistence upon section 16 of the act of 1907. Reading the whole act so far as relevant, and in particular this section 16, it seems clear that the government

cannot sustain the proposition that the alien was theoretically on the vessel.

[1] The word "landing" and the phrase "while on land" have two entirely different meanings.

When section 16 provides that a "temporary removal shall not be considered a landing," the reference is to landing as effecting the lawful entry of the alien into the United States. "Landing" refers, not to physically being on land, but to an act equivalent to an entry. In section 19 it will be noted that the cost of the maintenance of deported aliens "while on land" shall be borne by the owner of the vessel. Surely, if Congress deemed it necessary to provide in plain language that expense of maintenance "while on land" should be paid by the owners of vessels, in the case of aliens subsequently excluded, it would have expressly provided (if it so intended) that expense of maintenance of aliens ultimately admitted should be similarly paid. Section 19 recognizes that the alien, though not entitled to a "landing," may physically be on land, and he is on land whether at Ellis Island or elsewhere than on the vessel. Reading sections 16 and 19 together, it is apparent that the act had provided for a sensible and necessary method of handling these arriving immigrants.

We must not be lost in abstractions when we know that Congress was aware of the fact that thousands of immigrants often arrive in the great ports of the country on the same day, and that it is absolutely impossible to compel their examination on the incoming vessels. For that reason section 16 provided an alternative. The phraseology of the section should be carefully noted. The first duty of the immigration officers is to go to the vessel and there *inspect* the aliens. An "inspection" means such an inquiry as will then satisfy the officer as to the facts concerning the alien, and paragraph 5 of the stipulated facts shows that first and second cabin passengers are permitted to land at the docks without going to Ellis Island or elsewhere.

Referring again to section 16, it will be noted that the immigration officers may order a temporary removal of the aliens, not for inspection, but for *examination*. I see no escape from the conclusion that Congress intended in the act of 1907 that the course should be pursued which had long been pursued in dealing with these thousands of immigrants, namely, that, where the official could promptly determine the right of the alien to land, that determination should be promptly made on the vessel, but where, in the judgment of the immigration official, such determination could not be made promptly, then an examination should be had at a designated time and place.

Further, under section 16 it is required that "where a suitable building is used for the detention and examination of aliens the immigration officials shall there take charge of such aliens." Here the words "detention" and "examination" are used, and not the word "inspection." This proviso in section 16 is mandatory as applying to those who, for practical reasons of administration, cannot be inspected on the vessel. It is suggested by the government that, if this proviso be construed as mandatory, then first and second cabin passengers must be taken to Ellis Island. As I have pointed out, no such course is contemplated by

the statute, for the requirement to take charge of the aliens at a suitable building is only in those cases where inspection is not practicable and detention and examination become necessary.

I agree with the counsel for the government that the further provision in section 16 relieving the owners of vessels of responsibility during detention in a suitable building relates to responsibility for escape and safe-keeping, but it was unnecessary to deal with the payment for maintenance in this section, as that subject was already covered as heretofore pointed out.

In arriving at this conclusion I have not overlooked the provisions of the Passenger Act (Act Aug. 12, 1882, c. 374, 22 Stat. 186 (U. S. Comp. St. 1901, p. 2931), nor have I failed to realize that in some parts of the country there may not be suitable buildings in which to detain and examine aliens.

The result, however, is the same. If the practical situation at any port permits a speedy inspection, then such inspection should be had. If, on the other hand, examination or detention and examination are necessary, then the immigration officials can order a temporary removal of aliens for examination at a designated time and place.

[2] I have outlined as briefly as I can, within the limits of an opinion, the reasons why I conclude that the plaintiff has not sustained its first cause of action; but, if space permitted, it would not be difficult to elaborate by further reference to the act.

Finally, it must be remembered, under well-settled authority, that, as the liability created by section 19 is statutory and in the nature of a penalty, the defendant is entitled to a strict interpretation of the statute.

I have not discussed the alleged practical construction of the statute, for I think the various opinions (even if relevant) cannot be regarded as practical construction.

The Toth Case was officially determined by Mr. Straus, Secretary of Commerce and Labor, contrary to previous rulings, and thus the rulings of the administrative authorities are not consistent. These previous rulings (as well as the subsequent attitude of the Department) were constantly opposed and they were acquiesced in at times only because the defendant and others similarly situated could not help themselves.

[3] The threats to detain aliens of this character on the vessel were such as to amount practically to duress.

In these days no steamship company, in justice to its passengers, citizen or alien, and to its freight obligations, could afford to turn its vessels lying at our docks into hospitals and prisons, and, in such circumstances, it is not surprising that the defendant was willing to take any course which would relieve it from such an emergency.

The immigration officials had no right to order the deportation of these aliens, and, if the aliens could have been detained on the vessels while recovering from these nonexcludable diseases, some of the vessels would have been detained for weeks—a result neither contemplated nor justified by the statute.

If the plaintiff had no right to enforce payment for the maintenance

of these aliens ultimately admitted, then any agreement to pay for such maintenance lacks validity. The agreement relied on by plaintiff was made under duress and without consideration, and, even if it were admitted (for the sake of the argument) that the agreement of July 25, 1894, constituted a contract, that contract became inoperative, after the act of 1903 became law, and also by its own terms when the Secretary of Commerce and Labor decided the Toth Case.

In conclusion, then, we have a simple system. It is the duty of the officials to detain persons suffering with diseases, the nature and outcome of which are not clear, until such time as a proper examination can be made, and where, as in this case, a suitable building is provided, that duty must be there performed or, in any event, performed at some proper time and place and, in the event that the alien is ultimately admitted, his detention having been without fault or neglect on the part of the steamship company, the expense is not to be borne by the steamship company.

The defendant may have judgment on the merits,