## H. KISHI *v.* THE BRITISH STEAMSHIP "WILLESDEN."

### December 22, 1913.

1. *Maritime lien—Necessaries—Supplies of food furnished alien immigrants pending quarantine:* There is no maritime lien for the cost of supplies of food furnished to alien immigrants during their detention in quarantine on shore after they have been landed from a foreign vessel but have, technically, not yet been admitted to the country; and a suit *in rem* does not lie to recover for supplies so furnished.

2. *Aliens—Immigration—Rules and regulations under Immigration Act—Support of immigrants pending quarantine:* Rule 26 of the rules pertaining to immigration, Bureau of Immigration, Rules of Nov. 15, 1911, 3d ed. pp. 40-41, providing that "owners, masters, agents, and consignees of vessels bringing aliens shall pay all expenses [including maintenance] incident to or involved in their removal from the vessel or their detention . . . irrespective of whether the aliens removed or detained are subsequently admitted or deported", is invalid as unauthorized by and inconsistent with the Immigration Act, 34 Stat. 898, am. 36 Stat. 263. *U. S. v. Holland-American Line,* 205, Fed. 943, 946 [aff'd 212 Fed. 116], followed.

*In Admiralty:* Libel *in rem* for supplies.

*E. C. Peters* for libelant.

*L. J. Warren* (*Smith, Warren, Hemenway & Sutton* with him) for libellee.

CLEMONS, J.  This is a libel *in rem* against the steamship Willesden, a foreign vessel, to recover compensation for meals alleged to have been furnished to its passengers, alien immigrants, at the port of Honolulu, pending their examination by the United States immigration inspector as to their admission into the country.  Two causes of action are stated, one in the nature of a quantum meruit in assumpsit, based on the furnishing of meals to these passengers at the request "of the agents and servants of said ship acting for and on behalf of the owner thereof," and the other based on an obligation implied by law by virtue of rule 26 of the rules pertaining to immigration, which provides that "owners, masters, agents, and consignees of vessels bringing aliens shall pay all expenses [including maintenance] incident to or involved in their removal from the vessel or their detention . . . irrespective of whether the aliens removed or detained are subsequently admitted or deported."  Bureau of Immigration, Rules of Nov. 15, 1911, 3d ed., pp. 40-41.  The first cause of action alleges the meals to have been furnished to passengers "while detained" at the port of Honolulu, for the purpose of examination as to their "eligibility to admission" into the country "and until admitted," but does not state just where these meals were furnished, whether on board of the vessel or ashore.  The second cause of action is for meals furnished at the immigration station at Honolulu where the passengers had been "temporarily removed for examination," during which examination these meals were furnished at "the price privileged to be charged" and "under the direction of the inspector in charge of the port," by the libelant as holder of a special license to furnish meals there.

As, under both causes of action, the meals for which compensation is sought, are alleged to have been furnished between December 22d, 1911, and February 12th, 1912, and as the same bill of particulars of meals furnished, Exhibit

"A" of the libel, is given for both causes of action, the inference is warranted that the same meals are the subject of the two causes of action, and that, as alleged under the second cause of action, they were all furnished at the immigration station where the passengers had been "temporarily removed for examination." Also, the meaning is plain, under the allegations of the first cause of action, that these passengers were finally admitted. Such pleading, the allegation of facts by indirection, is not to be encouraged, but, as no objections are raised against it, the libel is read, for the purposes of the decision, according to its obvious, though implied, intent.

The claimant's exceptions to the libel raise the following points:

1. The want of showing that the passengers were brought to the United States on the steamship Willesden in violation of law or that any of the passengers were not legally eligible or entitled to enter the United States.

2. The want of a law or of a valid rule or regulation requiring the cost of maintenance of alien immigrants not brought here in violation of law, pending their examination as to eligibilty to enter the country, to be borne by the vessel's owner or to be borne by or made a charge against the vessel, or giving a lien upon the vessel or a right to proceed against her *in rem.*

3. The want of specification by name, description, or identification of the persons brought by said vessel in violation of law or not entitled to enter, for whose maintenance the libelant has any claim or lien against the vessel.

4. The want of showing that the meals were furnished to said vessel or for its account, use or benefit, or that they were necessary to or for said vessel;

5. Or that they were furnished by reason of any request, direction or authority of the owner or of any person having authority to request, direct, or agree for the same in his behalf.

6. The showing by the second cause of action that the meals were furnished at the special instance and request

of the inspector in charge of immigration, irrespective of and without any authority of or direction by the owner, master, or any agent of the vessel, and that the meals were not furnished on the credit of the owner, master, or vessel.

7. Inconsistency, duplicity, and multifariousness, in that the two causes of action are separately set forth, each inconsistent with and independent of the other, and based upon different grounds.

8. Defect of parties respondent, in failure to name or join the owner as respondent, without jurisdiction over whom (not here acquired) the court cannot proceed and cannot make any valid decree of condemnation against the vessel or other property of the owner.

9. Failure to state a cause of action within the court's jurisdiction.

[1a] The first two points constitute the claimant's main contention as to the second cause of action, which is that the Immigration Act (34 Stat. 898, am. 36 Stat. 263) provides only for maintenance of passengers by the owner of the vessel in case of "aliens brought to this country in violation of law" (sec. 19), and that any rule of the Department of Labor charging the vessel with maintenance of passengers not brought here in violation of law, is invalid. The same point was made in the parallel case of *United States v. Holland-American Line*, 205 Fed. 943, 946, in the southern district of New York [affirmed, 212 Fed. 116], and the decision of Judge Mayer ruled against the ship-owner's liability, after a discussion so thorough and satisfactory, that it is unnecessary to go over the same ground again here. The principle of *expressio unius, exclusio alterius,* justifies his construction of the statute.

"The act of 1907 specifies with great care the cases of instances which impose obligations or penalties upon the steamship companies. This, section 19 provides that all aliens brought to this country 'in violation of law' shall be deported on the vessel bringing them and that the cost of their maintenance while on land as well as the expense of the return of such aliens, shall be borne by the owner of

the vessel.  The act will be searched in vain for any provision which imposes expense upon the owners of vessels where there has not been neglect or a violation of law." Id., 946.

[2] And, further, the legislative will being so construed, it may not be set aside by a rule or regulation of an executive department of government.  See *United States v. Two Hundred Barrels of Whiskey,* 95 U. S. 571, 576, in which it is held in regard to departmental regulations:  "They may aid in carrying the law *as it exists* into execution, but they cannot change its positive provisions,"—"the law as it exists" being, of course, the law not only as plainly written, but as, perhaps, less plainly construed.  Especially is this so when a penalty is involved, as is in effect the case here.  *United States v. One Package of Distilled Spirits,* 68 Fed. 856, 858; *United States v. Three Barrels of Whiskey,* 77 Fed. 963, 965.  See, also, *United States v. Hemet,* 156 Fed. 285, 287-288; *In re Kornmehl,* 87 Fed. 314.

Rule 26 was not discussed by Judge Mayer, but a ruling of the department similar to rule 26 had his attention and he noted: that there had been constant opposition thereto; that any acquiescence therein had been under duress of circumstances; and that the ruling was contrary to previous departmental rulings, thus disposing of any argument of practical construction by the department.  Case of *Holland-American Line,* supra, 951.

Judge Mayer also pointed out that the statute affords ground for charging against what is known as the "immigrant fund", rather than against the carrier, such expenses as are here involved.  Id. 947-949.

As to the citation, in support of the libel, of section 16 of the act, which says that "temporary removal" of alien passengers from a vessel shall not relieve "the transportation lines, masters, agents, owners, or consignees of the vessel  .  .  .  from any of the obligations which, in case such aliens remain on board, would, *under the provisions of*

*this act,* bind said transportation lines," etc., suffice it to say that the qualifying words, "under the provisions of this act," exclude the operation of an unauthorized or invalid departmental rule. And it has already been shown that there are no "provisions of this act" charging expenses of maintenance against the carrier, except in case of aliens brought into the country in violation of law.

Accordingly, rule 26 is invalid so far as it contravenes section 19 of the act, which places the cost of maintenance upon the owners of the vessel only in case of aliens "brought to this country in violation of law." This disposes of the second cause of action.

[1b] Another fact may, however, be briefly adverted to as also disposing of that cause of action. Rule 26, if valid, would give nothing more than a remedy *in personam,* it having fixed the liability upon "the owners, masters, agents and consignees of vessels bringing aliens,"—a personal liability and not a charge *in rem* against these vessels. Even in case of aliens brought in contrary to law, their maintenance is not the foundation of a lien, but is charged to "the owner or owners of the vessels," under section 19 of the present act, although—and this is significant—an earlier statute, covering part of the same ground as the present act, and apparently superseded by it, made "such expense . . . a lien on said vessel(s)." 24 Stat. 414, 415, 3 Fed. Stat. Ann. 303, act of Feb. 23, 1887, sec. 8.

There remains, then, only the first cause of action, against which the more substantial exceptions, points 4 and 5 supra, are: the failure to show that the meals were furnished to the vessel or for its account, use or benefit, and the failure to show that they were necessary to or for the vessel. The effect of the latter exception is to challenge the procedure *in rem* for want of the essential, basic, lien. See *Mayne v. The Makura,* ante, p. 43; *The Corsair,* 145 U. S. 335, 347; *The Bold Buccleugh,* 7 Moore, Privy Council Cases,

267; s. c. Ames' Cases on Admiralty, 92, 94-95; Carver's Carriage by the Sea, 5th ed., sec. 698.

Apart from any requirement of the recent statute (not relied on by counsel here) "relating to liens on vessels for repairs, supplies, or other necessaries," 36 Stat. 604, act of June 23, 1910, which on the principle of *noscitur a sociis* applied to the language "repairs, supplies, or *other necessaries*," would afford a lien only for such supplies as are necessary, the general maritime law had already made necessity an element vital to such a lien. See *The Grapeshot,* 9 Wall. 129, 141; *The Brigantine Nicolaus,* 4 Haw. 354, 355. See also Adm. Rule 12, and, for an interesting and valuable discussion, Abbott, Ships and Seamen, 14th ed. 177-185. By the statute cited, necessaries are presumed to have been ordered on the credit of the ship, the statute in this regard being only declaratory of the general maritime law. *The Grapeshot,* supra, 141; *The Lulu,* 10 Wall, 192, 197, applying to a case of implied hypothecation (lien) the same principle applied to an express hypothecation (bottomry bond).

This element of necessity is sometimes spoken of as financial necessity, the need of credit (see *The Suliote,* 23 Fed. 919, 922); but for the purposes of pleading, it is practically the necessity for something which the credit is intended to secure,—not for the credit itself. Thus from the opinion in *Pratt v. Reed,* 19 How. 359, it appears that the necessity for credit is presumed if there be shown the necessity for the supplies and the actual giving of credit to the vessel. *The Lulu,* 10 Wall. 202-203. And from the court's holding in the cases of *The Lulu,* supra, and *The Grapeshot,* supra, we need consider merely the necessity for the supplies, without regard to the giving of credit to the vessel, for, as seen above, if the supplies are necessary, the credit of the ship is presumed.

In the law of maritime liens, the words "necessary" is of narrow scope. While it is not essential that supplies furnished be anything more than useful or convenient, 19 A.

& E. Enc. L., 2d ed., 1094-1095, it is indispensable that they be necessary, useful, or convenient in aid of the business in which the ship is employed,—i. e., they must be necessary, useful, or convenient to the ship in its maritime character, as a carrier by sea. There must be an actual or apparent necessity for the supplies to effectuate the object of the voyage, i. e., here the carriage of passengers, or to secure the safety of the vessel.

The term "necessaries" was held by Lord Tenterden to include whatever is fit and proper for the service in which the vessel is engaged, or whatever would have been ordered by a prudent owner if present. *Webster v. Seekamp,* 4 B. & Ald. 352, 354, 160 Eng. Rep. (Full Reprint), 966, 967; Benedict on Admiralty, 4th ed., sec. 196; Hughes on Admiralty, 96-98; 26 Cyc. 764, n. 99. The definition of the Supreme Court in the case of *The Grapeshot,* 9 Wall. 129, 141, is substantially the same:

"Necessity for repairs and supplies is proved where such circumstances of exigency are shown as would induce a prudent owner, if present, to order them, or to provide funds for the cost of them on the security of the ship."

The supplies of food furnished here, to passengers who were removed from the ship to the immigration station and who were finally admitted to the country, do not seem to fall within the narrow limits which determine a maritime lien. If this case was one of necessity, the necessity was plainly one respecting a matter collateral to the maritime venture on which the ship was then engaged. This conclusion is based upon the "reason and spirit" of the authorities, rather than upon any decision directly in point on the facts: for there are none that I have been able to find. As suggestive of this spirit, the case of *Diefenthal v. Hamburg-Amerikanische P. Actien-Gesellschaft,* 46 Fed. 397, may be cited, in which it is held that a contract with the owners to supply their vessels for a year with all the

provisions which they might require while in a certain port, is not a maritime contract.

The decision in the case of *The City of Mexico,* 28 Fed. 239, not cited by counsel, may be an authority in support of the libel. It allowed "expenses for provisions provided passengers and crew detained on board a vessel under seizure, after arrival in port, and before service of attachment under libel for forfeiture." But its use of the language, "the position of the passengers on board was different from that of *ordinary passengers* who had taken passage from port to port, and *whose voyage had terminated,*" might seem to distinguish it from the case at bar. See, also, *The Augustine Kobbe,* 37 Fed. 696 (syll., par. 5), 699.

When it is considered, that the maritime lien is a secret lien, following the ship into the hands of innocent holders, it is not to be extended to cases not clearly within its purview. See 26 Cyc. 751; *Stephenson v. The Francis,* 21 Fed. 715, 720. In the language of the *Hamburg-Amerikanische* case, supra, which comes nearest to the present case of any which has been found, other, perhaps, than the case of *The City of Mexico,* supra, the alleged transaction even "though relating remotely to navigation and commerce, is separated so far from them that it did not spring from the necessities of navigation, and is not within the considerations which make it essentially and distinctively maritime." *Diefenthal v. Hamburg-Amerikanische P. Actien-Gesellschaft,* 46 Fed. 397, 399.

"It need not be held that there could not be an admiralty suit in some cases where there is no maritime lien. But where the contract is for supplies, to bring it within the admiralty jurisdiction it must come within the reason that brings material-men within the dominion of admiralty courts,—i. e., it must appear that the necessities or conveniences of ships in ports remote from home ports require that a credit should be given and a debt created which, though arising on land, are distinctively maritime, because necessary to maritime commerce as conducted by ships." *Id.*

It has been seen that the rules of the immigration department created no legal liability to furnish these supplies. Also, there was no liability of the ship by reason of the contract of carriage, so far as the pleadings show, to provide food for her passengers while detained at the immigration station on shore pending their examination as to eligibility to admission to the country—these passengers having been eventually landed. And no liability of the kind is implied as against the carrier. The implied contract of the carrier of passengers by sea-going vessels is to "supply the passengers with such food and other accommodations as will be necessary for his health and comfort upon the voyage and as may be usual and customary upon such vessels and upon such voyages." 2 Hutchinson, Carriers, 3d ed., sec. 1156. In other words, there was no contract necessity for the carrier to maintain the passengers who had been taken ashore by the immigration officers. The implied contract pertains only to the voyage. When the voyage has ended and the passenger is finally ashore, whether for examination or for any other purpose which concerns himself personally and not the ship in its contract capacity as a maritime carrier, his maintenance is not a matter within the contemplation of the contract,—a contract which at best is raised only by implication. The question would, admittedly, be more doubtful if the passengers had been detained on the ship, but we may give such a case as that the full force which the libelant's counsel contends for it and still not hold the ship liable when once the passengers have gone ashore,—though, it is true, they have not, strictly, been "landed" in the technical sense of that word in the immigration law. See the case of the *Holland-American Line,* 205 Fed. at 950.

In my conception of the case, the relation between carrier and passengers, had ceased to be one which may be called maritime. See the analogous case of *The Pulaski,* 33 Fed. 383, in which a contract to hold a cargo in stowage

after arrival was regarded as not within the admiralty jurisdiction. And, in any event, any obligation to continue furnishing the passengers with food, was at an end when they went ashore.

It may be observed that the authoritative definitions of the term "voyage" afford little or no help. The question is not alone one of what terminates the voyage, but largely one of whether the carrier impliedly assumes an obligation not only to carry the passengers to the port of destination, but to land them there "unquarantinable," or "undetainable," and support them while in quarantine or detention,—an obligation not only to carry them overseas but to furnish, as it were, hotel accommodations for them for an indefinite time thereafter, when once they have been taken from the ship by the immigration authorities for reasons which do not involve any act or default of the carrier. I have not overlooked the fact that cases might perhaps arise,—though I am not called upon to so hold,—in which considerations of humanity might create an obligation to supply food to passengers even after landing. See *The President,* 92 Fed. 673, 675-676.

As to the exception of want of showing that the meals were furnished to the vessel, or for its account, use, or benefit: This exception is well taken. The allegation is, that "the agents and servants of said ship acting for and on behalf of the owner thereof, requested this libelant, that, pending examination by the United States immigration inspectors in respect to eligibility to admission into the United States, and while detained therefor, and until admitted by such inspectors into the United States, he maintain each alien to the extent of furnishing such alien with three meals daily." This is merely an allegation of something done "for and on behalf of the owner," and too broad to support a proceeding *in rem* against the vessel. Further, in view of the above conclusion that the contract of carriage imposed no liability, it cannot be presumed that

this request of the agents and servants was authorized, as it would have been if the furnishing of the food had been a matter of contract necessity or of other necessity, in which case, under the lien law, 36 Stat. 604, sec. 2, there would have been a presumption of authority in "the managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted" "to procure repairs, supplies, and other necessaries for the vessel." Wherefore, all the more reason for a specific allegation that the meals were furnished for the account of the vessel.

These considerations are sufficient to dispose of the first cause of action, without discussion of other exceptions, affecting matters of form and not of substance.

For the foregoing reasons, the exceptions are sustained, without prejudice, however, to any amendment of which counsel may be advised that the libel is capable.